544 F.2d 1059
 Fed. Sec. L. Rep. P 95,755
The BALLARD & CORDELL CORPORATION, Plaintiff-Appellee,
v.
ZOLLER & DANNEBERG EXPLORATION, LTD. and Zoller & Danneberg,
Inc., Defendants-Appellants and
Counter-Plaintiffs-Appellants,
v.
Wiley P. BALLARD, Jr. and Robert R. Durkee, Additional
Defendants-Appellees on Counterclaim.
 No. 75-1900.
 United States Court of Appeals,
Tenth Circuit.
 Argued and Submitted Sept. 23, 1976.
Decided Nov. 11, 1976.
Rehearing Denied Dec. 13, 1976.
 
 William R. Fishman, Denver, Colo. (David H. Drennen, Denver, Colo., on the brief), for appellants.
 Jeffrey L. Smith, Denver, Colo. (Marshall W. Taylor, Denver, Colo., on the brief), of counsel; Seawell, Cohen & Sachs, Denver, Colo., for appellees.
 Before McWILLIAMS, BREITENSTEIN and BARRETT, Circuit Judges.
 BARRETT, Circuit Judge.
 
 
 1
 Zoller & Danneberg Exploration, Ltd. and Zoller & Danneberg, Inc., defendants and counterclaimants below, hereinafter collectively referred to as ZDI, appeal from two orders of the District Court, to-wit: (1) the order of October 9, 1974, dismissing certain affirmative defenses and counterclaims of ZDI alleged to arise under § 12(2) of the Securities Act of 1933 and § 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder, and (2) the order and judgment of October 22, 1975, granted in favor of appellee, Ballard & Cordell Corporation, hereinafter referred to as B & C, and against ZDI in amount of $63,473.75 and costs and dismissing with prejudice ZDI counterclaims against B & C, Wiley P. Ballard, Jr. and Robert R. Durkee. Jurisdiction exists by reason of diversity of citizenship. B & C is incorporated under the laws of and maintains its principal place of business in Georgia. ZDI are incorporated under the laws of and maintains its principal offices and places of business in Colorado.
 
 
 2
 Trial was to the court. B & C initiated the action in 1973, alleging that it contracted with ZDI to sell its 50% working interests in certain oil and gas lease units relating to lands situate in the State of Oklahoma with two producing oil wells located thereon, one on each of the said two lease units, for the sum of $105,000.00. B & C contends that it has, at all times since entering into the contract, been ready, willing, and able to perform its covenant to sell but that ZDI has breached the contract and damaged B & C by reason of its refusal to purchase. In its basic defense to the suit, ZDI denies the existence of a valid, enforceable contract. Seven affirmative defenses were advanced, together with a three-count counterclaim.
 
 
 3
 A somewhat detailed review of the evidence is necessary to aid in our disposition of the contentions presented. We proceed with this review mindful that the appellate court must view the evidence in the light most favorable to the prevailing party and must affirm the trial court findings and conclusions unless they are clearly erroneous. Fed.Rules Civ.Proc. Rule 52, 28 U.S.C.A.; Garcia v. Gray, 507 F.2d 539 (10th Cir. 1974), cert. denied, 421 U.S. 971, 95 S.Ct. 1967, 44 L.Ed.2d 462 (1975); Scaramucci v. Dresser Industries, Inc., 427 F.2d 1309 (10th Cir. 1970).
 
 
 4
 ZDI were engaged primarily in the business of oil and gas exploration, commencing about March of 1969, during which time ZDI operated wells, participated in drilling operations and acquired oil and gas properties, including producing acreage. Henry Eugene Zoller, Jr. (Zoller, Jr.) served as president of both corporations (ZDI) during the times here involved. His professional background was that of a geological engineer. During the months of August and September, 1972, ZDI had "in house" technical staff which included engineers, petroleum engineers, petroleum geologists, accountants and landmen.
 
 
 5
 On December 4, 1970, ZDI received an offer from Texas Oil and Gas Corporation to acquire a 25% working interest in the "Adams Unit," one of the two wells here involved. ZDI acquired the interest and participated in the drilling of the Adams well on a joint venture basis with Texas Oil and Gas and B & C. ZDI had entered into many "deals" with Texas Oil and Gas of like nature prior thereto.
 
 
 6
 An offer was made by B & C in August of 1972 via brochures and an accompanying letter for the sale of its entire 50 percent working interest in two producing wells and the respective leasehold units, to-wit, Adams No. 1 and Eversole No. 1. The brochures were distributed to those engaged in similar enterprises. The brochures clearly stated that the information and data related therein was preliminary only and that any interested purchaser should seek additional information and data from B & C offices. As previously noted, ZDI was then the owner of a 25% working interest in Adams No. 1 and its lease unit. ZDI undertook negotiations with B & C for the purchase of B & C's interests. Zoller, Jr. played a "direct role, actually, in controlling the people who negotiated with their engineers." (R., Vol. I, p. 83). He testified that after the brochures were received ". . . we went to work immediately evaluating them . . . we were attempting to get updated information because we felt that the information we had was extremely out of date." (R., Vol. I, p. 84). Zoller, Jr. did not recollect that any specific request was made of B & C for updated information. He testified that a purchaser of any oil or gas well has risk in relation to unknowns and for that reason ZDI spent a great deal of time getting updated information on the wells. To this end, Zoller, Jr. employed for ZDI an "outside" consultant, one Norman Adams, to "evaluate the two wells along with our in-house petroleum engineer, Mr. Lueck." (R., Vol. I, p. 87). Adams and Lueck conducted an investigation. They made numerous telephone calls. Zoller, Jr. testified that he was made aware of reserve estimates relating to both wells supplied to B & C by Kiplinger & Associates, dated March 1, 1971, and March 1, 1972, and that Norman Adams made a similar report and estimate for ZDI. Adams' evaluation report was not submitted to B & C. Mr. Lueck, who had earned B.S. and M.S. degrees in petroleum engineering and who had worked for Continental Oil Company nine years and for King Resources three years, testified that his particular expertise employed with ZDI involved all aspects of production and operations; that he was very familiar with the procedures utilized by petroleum engineers in estimating recoverable reserves; that the most accepted method is to plot pressure versus cumulative production; that the fair market value of a producing property is directly related to the estimate of reserves; that he and Norman Adams, the independent consultant, were directed by ZDI to evaluate the Adams and Eversole wells; that the only pressure data that he and Adams reviewed and relied upon for evaluation purposes was the "initial" pressure data which did not reflect the substantially lower pressure data obtained by B & C and Texas Oil and Gas prior to recommendation that ZDI submit that which he and Adams believed to be a reasonable purchase offer for the B & C interests in the two wells and lease units, in amount of $105,000.00. This offer was tendered by ZDI via a telegram to B & C on September 8, 1972, subject only to delivery of merchantable title, said purchase to be effective October 1, 1972. The telegram was confirmed on a follow-up basis by a letter from ZDI to B & C on September 12, 1972. B & C evidenced acceptance by tendering the lease assignments on September 26, 1972. The lease assignments were acknowledged as correct and proper in a letter from ZDI requesting that prior to payment ZDI needed additional abstracts of title, additional title information on the Adams well-lease unit, title opinions and supplemental abstracts relative to the Eversole well-lease unit, and a bill of sale and inventories of equipment on the units being sold. All but a portion of the title material was thereafter supplied by B & C. There was considerable discussion and correspondence between the parties and attorneys relating to title requirements. On December 15, 1972, ZDI wrote B & C advising that it was withdrawing the offer to purchase because of delays in supplying title information and the fact that the "title to your interest in the above units is not merchantable . . ."
 
 
 7
 The trial court found that, (a) although merchantable title had not been furnished by B & C at the date of ZDI's withdrawal of the offer to purchase, that the outstanding title defects could have been adequately corrected by B & C, (b) from September of 1972 to December 15, 1972, the production and well pressure information and data relating to Adams No. 1 well reflected a decline, and that this information was available to ZDI as an owner of a working interest in the well, (c) ZDI attempted to terminate the contract of purchase by its letter of December 15, 1972, because of the decline in production and pressure as to Adams No. 1 well and not because of B & C's failure at that time to have furnished full merchantable title to the two units. The trial court placed substantial reliance for its finding set forth in (c) above on the fact that in January, 1973, Texas Oil and Gas Corporation, the operator, recommended to all parties in interest, including ZDI, that Adams No. 1 well be plugged and abandoned because it was no longer commercially feasible to continue its operation, based upon the decline in production and pressure data reflected in a report filed with the State of Oklahoma early in November of 1972. The court further found that ZDI did not terminate the agreement because of title deficiencies, as evidenced by an agreement between B & C and ZDI to expend funds as late as May of 1973 to rework the Adams No. 1 well in the hope of increasing its production. The trial court found that the "declining production and pressure of the Adams well prior to December 15, 1972, and May, 1973, support a finding that the defendant attempted to terminate the contract because it turned out to be a bad deal and not because of title insufficiencies." We agree.
 
 I.
 
 8
 ZDI contends that the trial court's 1974 order striking certain affirmative defenses and dismissing two counts of ZDI counterclaims, was clearly erroneous as a matter of law and fact. The trial court held that the 50 percent working interests in the two properties offered for sale by B & C were not "securities" as that term is defined in § 2(1) of the Securities Act of 1933 and § 3(a)(1) of the Securities Exchange Act of 1934. We agree.
 
 
 9
 The term "security" is defined in § 2(1) of the Securities Act of 1933 to include any "investment contract," any "fractional undivided interest in oil, gas, or other mineral rights," and any "certificate of interest or participation in any profit-sharing agreement." 15 U.S.C.A. § 77b(1). The term "security" as defined under the Securities and Exchange Act of 1934 includes any "certificate of interest or participation in any profit-sharing agreement or . . . in any oil, gas, or other mineral royalty or lease" and any "investment contract." 15 U.S.C.A. § 78c(a)(10).
 
 
 10
 We emphasize, just as did the trial court, that the fifty percent working interests in the two wells and lease units offered for sale by B & C, while a fractional interest, were offered as a whole and not in further fractional interests.
 
 
 11
 This Court has adhered to this rule laid down in S.E.C. v. Howey Co., 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946): That in determining the existence of a "security" the court should apply a flexible rather than a static principle, one capable of adaptation to meet the countless and variable schemes devised by those who seek to promote the use of others' money on the promise of or holding out of profit. Stevens v. Vowell, 343 F.2d 374 (10th Cir. 1965). See also : Hadsell v. Hoover, 484 F.2d 123 (10th Cir. 1973); Mitchell v. Texas Gulf Sulphur Co., 446 F.2d 90 (10th Cir. 1971), cert. denied, 404 U.S. 1004, 92 S.Ct. 564, 30 L.Ed.2d 558 (1971). This principle is in keeping with the broad remedial policies of the federal securities laws. J. I. Case Co. v. Borak, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964). While the definitions of sale and of security are to be liberally construed under the federal securities laws, still the courts have refrained from laying down any hard and fast rules as to what constitutes a security, and, instead, look to the substance rather than the form of the transaction in making a case-by-case determination.
 
 
 12
 In Woodward v. Wright, 266 F.2d 108 (10th Cir. 1959), this Court recognized that although the legislative policy in the Securities Act of 1933 was to bring all "securities" within the regulatory scope of the Act without regard to form or legal terminology, such does not render every transaction involving the sale of a fractional interest in oil, gas, or other mineral rights, ipso facto, the sale of a security. We there held that it was the manifest Congressional intent to exclude from the scope of the Act isolated sales or assignments of oil and gas leases or fractional parts thereof to specific persons, and to specifically include as securities only that form of splitting up of mineral interests which had been most utilized for speculative purposes, citing to S.E.C. v. C. M. Joiner Leasing Corp., 320 U.S. 344, 64 S.Ct. 120, 88 L.Ed. 88 (1943). Further, Woodward, supra, held that while the fractional undivided interests in oil and gas contemplated to be sold were created for purposes of sale and were, accordingly, "securities" within the meaning of the Act, still the offering was not a "public offering" under the Act requiring registration or invoking the absolute liability for failure to register because: (a) the whole transaction was a closely-knit arrangement among friends and acquaintances, involving purchasers with sophisticated discernment about the oil and gas business, and (b) the transaction was entered into after on-the-ground inspection and negotiation. Even though the transaction was not subject to the registration provisions of the Act and even though the seller was not an "issuer" under the Act, still we held that the purchasers were entitled to invoke § 12(2) of the Act, 15 U.S.C. § 77l (2), which creates a remedy for rescission or damages against any person who uses any means of interstate commerce or the mails to sell a security by means of a prospectus or oral statement which includes an untrue statement of a material fact or omits to state a material fact. Woodward, supra, further stands for the proposition that characterization of a "public offering" does not turn on the number of persons to whom the offer is made and it may be applicable to a few or many, citing to S.E.C. v. Ralston Purina Co., 346 U.S. 119, 73 S.Ct. 981, 97 L.Ed. 1494 (1953). Accord: Nor-Tex Agencies, Inc. v. Jones, 482 F.2d 1093 (5th Cir. 1973), cert. denied, 415 U.S. 977, 94 S.Ct. 1563, 39 L.Ed.2d 873 (1974).
 
 
 13
 Particularly significant to the case at bar is Gilbert v. Nixon,429 F.2d 348 (10th Cir. 1970) which involved an action for damages by the purchaser of fractional interests in thirteen oil and gas leases. We affirmed the District Court's findings and conclusions that: (1) the fractional interests were "securities" within the meaning of 15 U.S.C.A. § 77b(1) and15 U.S.C.A. § 78c(a)(10); (2) offers or sales of fractional interests in oil and gas leases to persons knowledgeable and experienced in such transactions, with whom the offeror had a long standing association in other leases were " transactions by an issuer not involving any public offering" as provided in15 U.S.C.A. § 77d(2), and thus were exempt from the absolute liability provisions of the Act; and (3) that there is no need under 15 U.S.C.A. § 77l (2) for a seller of a fractional interest to state every fact which, if known to the prospective purchaser, might tend to influence his decision. We cited favorably to Woodward v. Wright, supra, for the proposition that the fractional interests sold in Gilbert were "transactions by an issuer not involving any public offering." See also Garfield v. Strain, 320 F.2d 116 (10th Cir. 1963).
 
 
 14
 ZDI further contends that the District Court erred in finding that the sale of B & C's entire undivided interest in the two wells and lease units did not involve an "investment contract" and, therefore, a "security" under the federal securities acts. ZDI urges that the economic reality of this case is that ZDI was called upon to determine whether to make an investment and that inasmuch as all that was offered was a 50% working interest in two wells and lease units, with no additional acreage to be drilled, all that ZDI could be acquiring via the investment was "an interest in producing gas wells or, more precisely, an interest in the existing gas reserves." (Brief of ZDI, p. 20.) ZDI states that under these circumstances, it was relying solely upon the production from those reserves in order to obtain a return on its investment plus a profit.
 
 
 15
 The trial court recognized that the sale of an entire interest may involve an "investment contract" constituting a "security," citing to Lynn v. Caraway, 379 F.2d 943 (5th Cir. 1967), cert. denied, 393 U.S. 951, 89 S.Ct. 373, 21 L.Ed.2d 362 (1968). The court further cited S.E.C. v. Howey Co., supra, for the rule that the test for determining whether a particular transaction constitutes an investment contract is "whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others." 328 U.S., at 301, 66 S.Ct. at 1104. But, ruled the trial court, an investment contract must transfer more than a "naked leasehold right" and usually involves additional economic inducements, relying upon S.E.C. v. C. M. Joiner Leasing Corp., supra, and Roe v. United States, 287 F.2d 435 (5th Cir. 1961), cert. denied, 368 U.S. 824, 82 S.Ct. 43, 7 L.Ed.2d 29 (1961). The trial court further relied upon Mr. Steak v. River City Steak, Inc., 460 F.2d 666 (10th Cir. 1972) which quoted with approval Judge Arraj's opinion reported at 324 F.Supp. 640 (D.Colo.1970) for the proposition that the instant case does not involve an investment contract. By analogy, the Court observed that Mr. Steak, supra, involved a franchise agreement wherein the franchisor retained extensive supervisory authority and the franchisee was given control of the daily operations of the business. In holding that the agreement did not constitute an investment contract, this Court considered several important factors, including the nature of the investor's financial and managerial participation in the enterprise; the state of the investor's knowledge, skill, and expertise concerning the enterprise; and whether the investor is providing "risk capital" to finance a speculative venture. We agree with the trial court's analysis that no investment contract is involved in the case at bar:
 
 
 16
 The present case appears to involve nothing more than the transfer of a leasehold right. Since (B & C) was attempting to transfer its entire interest and, upon sale would have entirely removed from the enterprise, this is not a situation where the seller and buyer were entering into a common venture dependent for success upon the providing of capital by the buyer and management by the seller. The common enterprise, if any, existed between (ZDI) and Texas Oil and Gas Corp., the independent operator of the wells.
 
 
 17
 (ZDI) were indeed relying on the efforts of the independent operator and the question is whether they were relying solely on the efforts of the operator, as required by the Howey test. The terms of the operating agreement gave (ZDI) limited participation in the operation of the wells. (ZDI) were required to pay a stated percentage of the costs of operation, but could withhold consent for the incurrence of operating expenses in excess of $5,000, for the drilling of new wells on the unit area, and for the reworking, plugging back or deepening of any existing wells . . . in the event of non-agreement . . . a dissenting party can elect not to participate in the proposed operation . . . (ZDI) can also participate in the selection of a new operator, should the present operator sell his rights . . . Most investment contract cases involve the financing of speculative and poorly financed schemes by soliciting funds from uninformed and unskilled investors . . . (ZDI) are far from being uninformed or unskilled in the type of venture involved. It appears that (ZDI's) activities are concentrated in oil and gas production and exploration. Also, there is no indication that the enterprise was poorly financed, and the fact that the wells were producing negates the speculative nature of the lease. The attendant risk seems to be merely a normal risk of engaging in this type of business. Therefore, under the Mr. Steak, Inc. analysis, the present facts do not give rise to an investment contract.
 
 
 18
 R., Vol. X, pp. 120-122.
 
 
 19
 The trial court furthermore properly disposed of ZDI's contention that B & C was offering for sale a security under the 1934 Act in the form of a "certificate of interest or participation in any oil, gas, or other mineral royalty or lease" as set forth in 15 U.S.C.A. § 78c(a)(10). The court held that the term "security" is not to be defined differently under the 1934 Act than under the 1933 Act, inasmuch as the acts are to be considered in pari materia, both intended to cover similar interests. Tcherepnin v. Knight, 389 U.S. 332, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967); Mr. Steak, Inc. v. River City Steak, Inc., supra; Wasnowic v. Chicago Board of Trade, 352 F.Supp. 1066 (M.D.Pa.1972); Anderson v. Francis I. duPont & Co., 291 F.Supp. 705 (D.Minn.1968).
 
 
 20
 The court did not err in granting B & C's motion to dismiss the sixth and seventh affirmative defenses and counts I and II of the ZDI counterclaim, and in denying B & C's motion to dismiss or for summary judgment on ZDI's fifth affirmative defense and count III of the counterclaim based on allegations of common law fraud.
 
 II.
 
 21
 ZDI appeals the final judgment entered in accordance with the trial court's Findings of Fact and Conclusions of Law, dated October 22, 1975, where by B & C was awarded judgment against ZDI in amount of $63,473.75 and costs.
 
 
 22
 ZDI contends that the court erred in allowing B & C judgment because (a) B & C was guilty of common law fraud and deceit in its dealings with ZDI in that B & C did not relate to ZDI the information it had in its possession relative to the well pressure, (b) that B & C had a duty to convey to ZDI the new material adverse information regarding the wells, i. e., the data it had received from Texas Oil and Gas Corp. and B & C's expert, Kiplinger, relative to diminished well pressures indicative that the wells were practically non-productive at the time of purchase, (c) that the court's findings that ZDI was not misled by B & C's failure to reveal the July, 1972, gas pressure report and that the withholding was without intent to defraud is clearly erroneous, (d) that the court's finding that the decline in pressure which occurred between September and December, 1972, was information available to ZDI was clearly erroneous, (e) ZDI was entitled to rescind the contract because its consent thereto was not freely given and (f) any contract between the parties was unenforceable because B & C did not deliver merchantable title and could not do so within the time permitted by the contract for correction of deficiencies of title. We hold that the trial court did not err.
 
 
 23
 There is substantial evidence in the record supporting the trial court's finding of fact that the ZDI attempt to terminate the purchase contract via its letter of December 15, 1972, was based upon its knowledge of the declining production and gas pressure relating to Adams No. 1 well and not because of B & C's failure at that time to have furnished evidence of marketable title. We have heretofore discussed in some detail the material facts supporting the above finding.
 
 
 24
 In disposing of the ZDI allegation that B & C was guilty of common law fraud, we concur with the trial court's finding that B & C was not under a duty to voluntarily disclose adverse pressure data reported by its expert to ZDI as a prospective purchaser and that in the oil and gas industry such evaluations are not customarily exchanged between a prospective seller and prospective purchaser. The trial court properly found that B & C obtained the expert engineering report of the Kiplinger firm in August, 1972, which was based in part on information from Texas Oil and Gas Corp. that a shut-in tubing pressure test of July, 1972, indicated pressure of 960 p. s. i., which was considered by Kiplinger when it reported to B & C that neither of the two wells would last much longer; that while the 960 p. s. i. was apparently erroneous because the correct pressure for Adams was 900 p. s. i. in May, 1972, and 625 p. s. i. in July, 1972, still the 960 p. s. i. was reported by error, which was not then known to be the case by B & C. ZDI contends that the lower and accurate figure was critical information to which it was entitled. The trial court properly found that there is no evidence that B & C was informed of the 625 p. s. i. test made in July of 1972. Insofar as B & C's obligation to ZDI is concerned, the court referred back to that portion of the original brochures which initiated the negotiations. The court placed particular emphasis upon the proviso under the heading of "Purpose" which reads:
 
 
 25
 The purpose of this report is to provide the information necessary for a preliminary evaluation . . . additional information and documentation for the data presented here may be inspected in the offices of the Ballard & Cordell Corporation in Lafayette, Louisiana.
 
 
 26
 The trial court found that ZDI did not seek additional information and documentation from B & C, but instead employed its own consulting engineer in the person of Norman Adams, to make an independent evaluation of the wells in conjunction with its Mr. Lueck; that Adams thereafter made his own investigation, including an inquiry of the Texas Oil and Gas Corp. for pressure and production information; that for some undisclosed reason, Texas Oil and Gas Corp. did not report to Adams the July, 1972, pressure of 960 p.s.i. which appeared in its records but that B & C was not aware of this fact; that B & C's failure to reveal to ZDI the apparently erroneous pressure report submitted to it by Texas Oil and Gas Corp. relative to the status of the Adams well in July of 1972, coupled with the adverse report by Kiplinger, was not done with intent to defraud; that B & C was not obliged to disclose an expression of opinion of an expert it employed to ZDI as a prospective purchaser in the norm of the day-to-day practice in the oil and gas industry, evidenced by the fact that ZDI did not submit to B & C the evaluation of the wells made by its expert, Adams; that there is no evidence which would impose a duty on either B & C or ZDI to disclose the opinions of their respective experts; and that B & C did not at any time make any misrepresentations of material fact to ZDI. We concur. These findings are not clearly erroneous.
 
 
 27
 We further concur with the trial court findings that there is substantial evidence demonstrating that B & C was not guilty of fraud, actual or constructive; that there was no mutual mistake of fact existing between the parties when the contract was entered into; that B & C was under no affirmative duty to disclose subsequent adverse data it had secured after the contract was entered into; that ZDI chose not to exercise its contract right of inquiring of B & C for "additional information and data" as set forth in the brochures but elected to rely on information obtained by its "in house" staff and its consulting expert, Mr. Adams.
 
 
 28
 We have carefully considered the balance of ZDI counterclaims, defenses, or contentions. We hold that they are without merit.
 
 
 29
 WE AFFIRM.