David SPATZ and Charles Janda, Plaintiffs,

v.

Joseph BORENSTEIN and Stanley Melnick, Defendants.

No. 76 C 4477.

United States District Court, N. D. Illinois, E. D.

Feb. 23, 1981.

Supplemental Opinion Filed May 1, 1981.

Michael K. Wolf, Michael A. Weinberg, Levy & Erens, Michael G. Erens, Kamensky & Landan, Chicago, Ill., for plaintiffs.

Margaret Maxwell, Hubachek & Kelly Ltd., Chicago, Ill., for defendant Borenstein.

Richard M. Kates, Chicago, Ill., for defendant Melnick.

## MEMORANDUM AND ORDER

MORAN, District Judge.

Plaintiffs David Spatz ("Spatz") and Charles A. Janda ("Janda") have moved for summary judgment on Counts III through VI in this action alleging violations of § 12(2) and § 17(a) of the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa (the "Securities Act"), § 10(b) of the Securities and Ex- change Act of 1934, 15 U.S.C. §§ 78a–78hh (the "Exchange Act"), Rule 10b–5 of the Securities and Exchange Commission, 17 C.F.R. § 240.10b–5, and § 12 of the Illinois Securities Law of 1953, Ill.Rev.Stat. ch. 121½, § 137.1 *et seq.*, by defendants Joseph Borenstein ("Borenstein") and Stanley Mel- nick ("Melnick"). Plaintiffs also seek sum- mary disposition against Borenstein for al- leged breach of fiduciary duty.[1] The court has examined the pleadings, discovery and affidavits submitted in conjunction with the joint motion. This review indicates that although genuine issues of fact remain with respect to certain discrete issues in the ac- tion, a great majority of questions are ame- nable to resolution as a matter of law. And on the basis of these matters plaintiffs have established violations of the securities laws. Accordingly, summary judgment is granted in favor of plaintiffs against Borenstein and denied against Melnick.

## FACTUAL BACKGROUND

The instant dispute concerns the sale of limited partnership interests by defendant Borenstein to Spatz and Janda. The sale of the partnership interests was part of a more complicated three-tiered transaction, the underlying purpose of which was to acquire an interest in an apartment com- plex known as Laurel Glen Apartments (the "Apartments" or the "Property"), located in State College, Pennsylvania.

The apartment complex was constructed in 1973 and upon its completion was man- aged by its owner, Laurel Glen, Inc. ("L. G., Inc."). The property was originally fi- nanced by securing first and second mort- gages, the latter with the National Union Fire Insurance Company ("National Un- ion"). During late 1974, L. G., Inc. default- ed on the first mortgage. In order to pro- tect its interests, National Union cured these defaults and took possession of the property under the terms of the second deed of trust.

---

1. In light of the court's disposition of Counts III through VI, however, an examination of the merits of this claim is unnecessary.

In April, 1975, defendant Melnick assumed management of the apartments from, and at the request of, National Union.[2] In accordance with Melnick's stated desire to acquire an equity interest in the property, National Union contacted defendant Borenstein with a view toward putting together a syndicate of investors to acquire the apartment complex.[3] As a result of discussions between Borenstein, Melnick and National Union, an arrangement for acquiring the property was conceived in the fall of 1975.

In basic part, the contemplated transaction was structured as follows: Borenstein would organize and become the sole General Partner of an Illinois limited partnership to be called Laurel Glen, Ltd. ("Limited"). The 595 units in Limited would then be offered for sale to investors at a price of one thousand dollars per unit. When and if the offering of units was fully subscribed, Limited and Melnick would each purchase fifty per cent interests in, and become sole General Partners of, a general partnership to be known as Laurel Properties ("Laurel Properties").

At the same time, Melnick, through U. S. Management, would acquire all of the stock of L. G., Inc., which still held legal title to the property. Laurel Properties would purchase the property from L. G., Inc. pursuant to a document entitled Articles of Agreement for Warranty Deed (the "Agreement"). Finally, Laurel Properties would lease the apartment complex to L. G., Inc. and Melnick personally, for a period of three years. As security for performance of its obligations as lessee, L. G., Inc. agreed to pledge all of its stock to Laurel Properties.

To implement the deal, Borenstein sent plaintiffs copies of a document entitled "Laurel Glen, Ltd. Private Placement Memorandum," dated October 15, 1975 (the "Prospectus"). On the basis of this document, Spatz and Janda purchased 102 and 100 units in Limited. When the offering of Limited's units was fully subscribed, the remainder of the transaction described above was effected.

## DISCUSSION

As is often the case in deals that end in litigation, the expectations of Limited's investors were not satisfactorily fulfilled. The results, in this instance, are Spatz' and Janda's claims of securities fraud based on what they allege to be certain material misrepresentations in the Prospectus and other material omissions which induced them to invest in the deal. In opposition to the joint motion for summary judgment, Borenstein and Melnick resist the conclusion that any misrepresentations or omissions existed, or, if they did, defendants deny that they were material.

### 1. Preliminary Legal Issues.

Initially, defendant Borenstein has raised two "blanket" defenses. First, he claims that no private right of action exists under § 17(a) of the Securities Act. However, at least in this circuit, this issue already has been decided adversely to him. *Lincoln National Bank v. Herber*, 604 F.2d 1038, 1040 n.2 (7th Cir. 1979); *Daniel v. International Brotherhood of Teamsters, etc.*, 561 F.2d 1223, 1244–1246 (7th Cir. 1977), *reversed on other grounds sub nom. International Brotherhood of Teamsters v. Daniel*, 439 U.S. 551, 99 S.Ct. 790, 58 L.Ed.2d 808 (1979); *Schaefer v. First Na-*

---

2. In reality, the management of the apartments was assumed by U.S. Management Co., a company controlled by Melnick. Melnick was brought into the transaction by an agent of National Union, Mr. Weisman, with whom Melnick had previous dealings. National Union had commissioned economic studies of the apartment complex and had concluded that the property potentially was a sound investment.

U.S. Management agreed to step in and manage the complex with the understanding that, ultimately, it would obtain some sort of equity interest in the property.

3. Borenstein also entered this scenario through the aegis of National Union, who was aware of Borenstein's reputation for arranging successful real estate syndications.

*tional Bank of Lincolnwood*, 509 F.2d 1287 (7th Cir. 1975).[4]

Defendant's second preliminary defense is no more viable than his first. Borenstein claims that a genuine issue of fact exists as to whether the sale of the limited partnership interests in Laurel Glen, Ltd. qualified for the private placement exemption of § 77d(2). If so, Borenstein argues, then the anti-fraud provisions of the 1933 and 1934 Acts, § 12(2), § 17(a) and 10(b) respectively, are inapplicable to the transaction at issue.

Several courts have addressed this issue head-on, holding that the private placement exemption does not diminish the force or reach of the anti-fraud provisions of the securities laws. *Ballard & Cordell Corp. v. Zoller & Danneberg Exploration, Ltd.*, 544 F.2d 1059, 1064 (10th Cir. 1976); *Nor-Tex Agencies, Inc. v. Jones*, 482 F.2d 1093 (5th Cir. 1973); *Sohns v. Dahl*, 392 F.Supp. 1208 (W.D.Va.1975). And although the Seventh Circuit has not considered the issue in the specific context of the exemption in § 4(2), in the *Daniel* case, *supra*, the court did hold that employee pension funds, exempted from the registration requirements of § 5 of the 1933 Act, 15 U.S.C. § 77e, by § 3(a)(2)(A) of the same statute, 15 U.S.C. § 77c(a)(2)(A), were still subject to the constraints imposed by sections 17(a), 10(b) and Rule 10b–5.

■ The presence of a different exemption here does not suggest a result different from that reached in *Daniel.* The language of the anti-fraud provisions specifically encompass registered and unregistered securities.[5] Moreover, the conclusion reached herein is consistent with the Supreme Court's well-worn admonition that the securities laws should be enforced "flexibly to effectuate ... their remedial purposes." *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 195, 84 S.Ct. 275, 284, 11 L.Ed.2d 237 (1963).[6]

■ As a final "preliminary" matter, since the contours of securities law have changed rather dramatically in the recent past, it is helpful briefly to sketch the elements of plaintiffs' case on summary judgment. Spatz and Janda rely on several provisions of the federal securities laws here, and the elements of each claim vary significantly. Count III alleges a violation of § 12(2)[7] of the Securities Act. The elements of such a violation were set out in *Sanders v. John Nuveen & Co., Inc.*, 619 F.2d 1222 (7th Cir. 1980), where the Seventh Circuit reasoned that liability attaches to one who offers or sells a security[8] by means of a prospectus which includes "an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements ... not misleading...", without proof of reliance or scienter.

■ In contrast to § 12(2), it is well-established that to establish a violation of § 10(b) of the Exchange Act, proof of scienter and reliance, as well as material misrepresentations or omissions, is required. *See, Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976); *TSC*

---

**4.** *But see, Aaron v. Securities Exchange Commission*, 446 U.S. 680, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980) where the Supreme Court expressly noted that it had not yet resolved this issue. *Id.* at 1951.

**5.** For example, § 12(2) of the Securities Act applies in pertinent part, to:
Any person who ...
(2) offers or sells a security (whether or not exempted by the provisions of section 77c of this title ...).

**6.** Borenstein's argument regarding the effect of the private placement exemption might well have bearing on the ultimate resolution of the charge in Counts I and II of the complaint. Plaintiffs, however, have not moved for sum-mary judgment on this claim which alleges violations of §§ 5 and 12(1) of the Securities Act and which alleges violations of §§ 5 and 12(A) of the Illinois Securities Act.

**7.** Count VI of the complaint alleges a violation of § 12 of the Illinois Securities Act, the statutory counterpart of § 12(2) of the Securities Act. For all relevant purposes, all references to the latter herein are applicable to this section as well.

**8.** Defendants have not challenged the fact that the sale of the limited partnership interests here constitutes the sale of a security as contemplated by the federal securities acts.

*Industries, Inc. v. Northway,* 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1977); *Sundstrand Corp. v. Sun Chemical Corp.,* 553 F.2d 1033 (7th Cir. 1977).

■ The elements of a violation of § 17(a) of the Securities Act have never been delineated as clearly as those for § 10(b). This is hardly surprising in view of the fact that these two provisions are largely complementary, and because plaintiffs have often "boot-strapped" § 17(a) allegations to their 10b–5 claims. Until recently, the elements of proof for the two sections were regarded as identical. However, the Supreme Court in *Aaron v. Securities Exchange Commission,* 446 U.S. 680, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980), recently held that, although scienter is an element required by § 17(a)(1), the language of §§ 17(a)(2) and 17(a)(3) requires only negligence to complete the violation.[9]

**2. The Existence of Material Misrepresentations or Omissions.**

■ Given the legal context set out above, the question addressed to the court is whether plaintiffs have established that no genuine issue of fact exists as to whether certain statements made by Borenstein were false and whether certain other facts were not disclosed, thus rendering the information available to plaintiffs misleading. In addition, the court must determine whether these statements or omissions were material as a matter of law under the standard articulated by the Supreme Court in *Northway, supra.* Since under the precedent Spatz' and Janda's reliance may be inferred from any omissions but not from any false statements (*see,* note 14, *infra*), the two types of statements are considered separately below.

**a. The Alleged Misrepresentations.**

Each of the statements characterized by plaintiffs as false or misleading is contained in the Prospectus, which Borenstein drafted to sell the limited partnership interests in Limited. Plaintiffs claim the following portions of the Prospectus were false or misleading: (1) "To date the occupancy rate [of the apartments] is approximately 96% on an annual basis"; (2) "As additional security for Lessee's performance of its lease obligations, Mr. Melnick has pledged to the General Partnership [Laurel Properties] ... all of the issued and outstanding stock of Laurel Glen, Inc."; (3) "Effective December 1, 1975, the General Partnership entered into Articles of Agreement ... with the Seller of the Property [Laurel Glen, Inc.] ..."; and (4) that the Prospectus misrepresented the amount of money needed in the first calendar year of the deal for repair and maintenance of the property when in its "Operating and Expense Statement" it listed under an item captioned "Replacements" an amount of $15,000.

On this motion, plaintiffs have established beyond doubt that each of these statements was false. Defendant Melnick, in his deposition, admitted that the occupancy rate of the Laurel Glen apartments was not 96% "on an annual basis." Rather, Melnick stated that the apartments were approximately 96% occupied during September through May of each year, but, since College Park was a "university town", during the summer months the complex was only 50% rented. Thus, on an annual basis, the apartments were only 85% occupied.[10] (Melnick Dep. at 112–114.)

Similarly, Melnick also testified that, contrary to the claim in the prospectus that

**9.** The court is cognizant of the fact that the Supreme Court, in *Aaron,* addressed the question of whether scienter was required in the context of a SEC civil enforcement proceeding. An examination of the Court's opinion, however, reveals no basis to conclude that the scienter requirement would not be absent in private civil actions under §§ 17(a)(2) and (3) as well.

**10.** The court has considered Borenstein's argument that, when considered in its context, the 96% figure was not misleading. Quite simply, *the argument is preposterous.* It requires the court to distort the clear and unambiguous language of the Prospectus. The "context" cited by Borenstein suggests that in the future only one-year leases would be offered. It in no way suggests that the current occupancy rate was anything other than that which was stated.

"all of the issued and outstanding stock" in Laurel Glen, Inc. would be pledged as security, only 26 of the 50 outstanding shares in that entity were pledged. (Melnick Dep. at 40.)

The falsity of the Prospectus' claim that Laurel Properties and L. G., Inc. entered into a binding agreement "effective December 1, 1975" is also established by the record. The clear implication of the Prospectus is that *as of* October 15, 1975 (the date the Prospectus was issued) a binding agreement between the parties had been accomplished, to be effective at a later date. In fact, the Agreement could not be and was not closed until after December 1, 1975 (making the statement false on its face). More to the point, until sometime in December, Melnick, the seller in this transaction, possessed only an option to acquire the stock of L. G., Inc. and had only orally agreed to cause L. G., Inc. to sell the property to Limited, an agreement of doubtful legal enforceability. He did not actually come into possession of the shares until after December 1. (Melnick Dep. at 40, 172–173; Borenstein Dep. at 52–53.)

Finally, Borenstein himself suggested that the $15,000 amount stated for repairs and maintenance was inaccurate. Borenstein testified in his deposition that the item labelled "Replacements" referred to repairs and maintenance and, as the following colloquy illustrates, that he was cognizant of the fact that these expenses were understated:

Q: Did you have reason to believe based on the discussions that you had with Mr. Melnick and Mr. Weisman in the Fall of 1975 that $15,000 was an accurate reflection of the amount that would have to be expended?

A: [Borenstein] No.

(Borenstein Dep. at 80.)

■ Even if we accept Borenstein's present contention that "Replacements" referred only to minor repairs, as distinguished from more major capital expenditures contemplated as necessary, nowhere is there a disclosure that such additional expenditures would be necessary.

### b. The Alleged Omissions.

In addition to the affirmative misrepresentations, plaintiffs allege that the Prospectus failed to state certain material facts necessary in order to make the Prospectus' other statements not misleading. In particular, Spatz and Janda assert that Borenstein (through the Prospectus) failed to disclose that 25 of the 562 units in the Laurel Glen apartment complex were "below grade" and thus uninhabitable. The Prospectus also failed to disclose that, prior to the preparation and distribution of the offering, payments on the mortgages encumbering the property became delinquent. Finally, the plaintiffs allege that the failure to inform the investors of certain tax and judgment liens along with another $100,000 mortgage on the property was a material omission within the scope of the securities laws.

■ That these facts were not disclosed is well-documented in the record—so well-documented, in fact, that Borenstein has not directly attempted to controvert the conclusion that these facts were not disclosed. Rather, Borenstein argues that since the information was "available" to the investors upon further inquiry and investigation, the information was not really "omitted". In essence, Borenstein's position is that plaintiffs failed to use "due diligence" in investigating the true facts behind the Prospectus. The Seventh Circuit, however, has repeatedly rejected attempts by defendants in Borenstein's position to impose a "due diligence" requirement on potential investors. *Sanders v. John Nuveen & Co., Inc.*, 619 F.2d 1222, 1229 (7th Cir. 1980) (hereinafter "Sanders IV".) *Sundstrand Corp. v. Sun Chemical Corp.*, 553 F.2d 1033, 1048 (7th Cir. 1977). In *Goodman v. Epstein*, 582 F.2d 388 (7th Cir. 1978), the court stated:

... [S]everal courts, including this one, have now determined that the outcome in *Hochfelder* necessitates a move away from requiring the plaintiff to have exercised "due diligence" in acquiring knowl-

edge about his investments before allowing him to recover from the defendant .... The *Hochfelder* decision and its progeny require us to move away from a "due diligence defense" with regard to the substantive merits of a 10b–5 claim. *Goodman v. Epstein,* 582 F.2d at 403–404.[11]

█ This circuit's rejection of a "due diligence" defense renders the precedent cited by defendant from other jurisdictions inapposite. *See e. g., Dupuy v. Dupuy,* 551 F.2d 1005 (5th Cir. 1977); *McLean v. Alexander,* 420 F.Supp. 1057 (D.Del.1976). Moreover, a consequence of the absence of any due diligence standard is the absence of any absolute duty to investigate. *Hill York Corporation v. American Int'l. Franchises, Inc.,* 448 F.2d 680, 696 (5th Cir. 1979). And finally, Borenstein's duty to disclose is not mitigated by the fact that Spatz and Janda may have been experienced investors. The securities laws entitle all investors, both the experienced and the novice, to the full and truthful disclosure of material information. *Sanders IV* at 1229; *Hill York Corp. v. American Int'l. Franchises, Inc., supra.* Accordingly, the fact that plaintiffs possibly might have inquired further to discover additional information not disclosed by the Prospectus does not vitiate any legal liability that flows from any failure to disclose material facts.

> c. *The Materiality of the Misrepresentations and Omissions.*

One need not be clairvoyant to discern from a review of the memoranda that Borenstein's defense is not premised most heavily on his denial of the misrepresentations and omissions. Rather, he has saved his "silver bullet" for his attempt to rebut the inference that the alleged omissions and misrepresentations were material. Even here, however, he has largely failed.

█ The court is cognizant of the fact that in determining the materiality of omissions and misrepresentations on summary judgment it must tread lightly. In *TSC Industries, Inc. v. Northway,* 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1977), the Supreme Court articulated the standard of materiality with the admonition:

> In considering whether summary judgment on the issue is appropriate, we must bear in mind that the underlying objective facts, which will often be free from dispute, are merely the starting point for the ultimate determination of materiality. The determination requires delicate assessments of the inferences a "reasonable shareholder" would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly one for the trier of fact. Only if the established omissions are "so obviously important to an investor, that reasonable minds cannot differ on the question of materiality" is the ultimate issue of materiality appropriate for summary judgment.

*TSC Industries, Inc. v. Northway,* 426 U.S. at 450, 96 S.Ct. at 2133.

The fact that the Supreme Court has counseled caution, however, does not diminish this court's authority to determine the issue of materiality on motion. F.R.C.P. 56. Nor does *Northway* suggest that in making this determination the court must discard its ability to make common sense judgments as to which facts or omissions were obviously material when the facts and circumstances so warrant.

---

**11.** An argument can be made that after *Aaron v. SEC, supra,* a due diligence requirement applies under §§ 17(a)(2) and 17(a)(3) of the Securities Act, since in *Sundstrand, supra* the Seventh Circuit rationalized the absence of such a defense upon the imposition of the element of scienter in *Hochfelder.* However, in *Sanders IV, supra,* the court of appeals expressly rejected the notion of a due diligence defense under § 12(2) which, concomitantly, has no scienter element. In view of *Sanders IV,* which is the most recent expression on the question from the Seventh Circuit, and because it would be anomalous to allow a "due diligence" defense under §§ 17(a)(2) and (3) but not under §§ 12(2), 17(a)(1) and 10(b), defendants' due diligence defense is not accepted here. In any event, this court need not even resolve this difficult question since plaintiffs have established violations of § 12(2) and 10(b), and these provisions alone provide a sufficient basis to grant plaintiffs the relief they seek.

■ As noted above, that false statements were made and that failures to disclose occurred is not in dispute. In the court's view, certain of these failures are inherently so important to reasonable investors that they are material as a matter of law. Two overarching conditions have led to this conclusion. First, it must be considered that plaintiffs were induced to invest in a venture which had only a single asset—the Laurel Glen Apartments. Distortions as to the value of this asset thus necessarily would color an investor's view of the entire deal. Second, and more importantly, all of the statements characterized as material herein have a direct bearing on the *value, profitability* and *risk* which could be assumed and expected by the investors in Laurel Glen.

Among the class of material statements is the misrepresentation as to the actual occupancy rate of the Laurel Glen Apartments. The occupancy rates in the apartment complex would have a direct correlation to the potential cash flow and profitability of the property. The higher the occupancy rate, the greater the profitability of the venture and *vice versa*. As such, a reasonable investor, at all concerned with obtaining a return on his or her investment, would have considered such fact important in making his decision. The same may be said with respect to the misrepresentation as to the projected expenses for upkeep, whether designated as repair and maintenance or as capital improvements. Such expenses not only bear directly on the profitability of the investment but also on the value of the asset being purchased by the partnership. Only the highly imprudent speculator would commit his resources to a property venture without regard to the actual value of the property and the amount of money needed to repair and maintain it in a condition in which it could generate profits.

Common sense also dictates that the failure to disclose both that 25 apartment units were "below grade" and thus uninhabitable and that a significant dollar amount in liens and mortgages existed on the property were material. Income from the property is only generated through the rental of the units. The subtraction of a significant number of units from the market would obviously impact adversely on the value of the property and its ability to generate profits. This is precisely the type of information the "reasonable investor" would demand be available. The existence of a significant dollar amount of encumbrances on the property which is the sole asset of the partnership in which the investor is being induced to invest is material in much the same way.

Finally, the court is of the opinion that the failure to disclose the prior mortgagee's default on the first mortgage was a material omission. Borenstein argues that this fact was not material because: (1) the default was eventually cured by National Union, the second mortgagor, and (2) the prior default was caused by managerial inadequacies peculiar to the prior management of the apartment complex and was not due to the inherent unprofitability of the property. Even assuming, however, that these statements are true, this does not diminish the materiality of the omission. Once again, common sense dictates that a reasonable investor would demand to be privy to this information so that he could make his own judgment on these facts. The fact that at least one mortgagee had defaulted on the property would at least caution a subsequent investor from investing in the same property without first convincing himself that the investment itself was sound. Without the disclosure of this underlying information, such a determination could not be made.

The materiality of the representations respecting L. G., Inc. stock and the existence of a subsequently effective agreement is less certain, and, in view of this court's conclusions respecting the other representations or omissions, it reaches no conclusion as to those two matters.

### 3. *Defendant Borenstein Acted With Scienter.*

■ Since plaintiffs have alleged violations of several provisions of the securities

laws, as indicated above, the requirements of scienter vary between the several counts. As indicated above, plaintiffs must establish scienter with respect to the alleged violations of § 17(a)(1) and § 10(b) of the 1933 and 1934 Acts respectively. The § 12(2) and 17(a)(2) and (3) charges, as well as the alleged violation of § 12 of the Illinois Securities Act, require only that plaintiffs demonstrate that defendants breached their duty to act with reasonable care in assuring the Prospectus was accurate. *Aaron v. Securities Exchange Commission, supra; Sanders IV*, 619 F.2d at 1228 (no scienter required to establish a 12(2) violation).

Scienter is established by proof of an intent to defraud, *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), or of reckless behavior, *Sundstrand Corp. v. Sun Chemical Corp.*, 553 F.2d 1033 (7th Cir. 1977). In *Sundstrand*, the court defined recklessness as follows:

> "reckless conduct may be defined as a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." [12]

*Sundstrand Corp. v. Sun Chemical Corp., supra* at 1045.

The court has reviewed the record submitted here. On the basis of the depositions of Melnick and Borenstein plaintiffs have established that no genuine issue of fact remains with respect to the following: (1) that Borenstein knew of the existence of the default of the prior mortgagee (see Borenstein Dep. at 71, 84); (2) that Borenstein knew of the existence of liens and other encumbrances on the property other than those disclosed in the Prospectus (see Borenstein Dep. at 97); (3) that Borenstein knew that at least 15, and probably 25, of the apartments were uninhabitable (see Borenstein Dep. at 25–26, 32; Borenstein Dep. II at 29); (4) that Laurel Properties had not entered into an agreement with L. G., Inc. effective December 1, 1975 and that not all of the stock in L. G., Inc. had been pledged as security (see Borenstein Dep. at 52–53); and (5) that $15,000 was not an accurate projection of repair and maintenance expenses (see Borenstein Dep. at 80); Borenstein's deposition indicates that he was aware that the leases at the complex were on a nine-month basis. He clearly stated, however, in the Prospectus that the 96% occupancy figure stated was on an annual basis. (See Borenstein Dep. at 71.)

■ This court is well aware that a specific intent to defraud, a subjective state of mind, is an issue peculiarly inappropriate for resolution by summary judgment. Defendants, moreover, deny such an intent. Here, however, various representations were clearly material and knowingly false, various omissions concerned matters which were obviously material and which were known to Borenstein. Those misrepresentations and omissions were within a context of other knowingly false, although not clearly material, representations. The total impact was to convey a highly misleading picture of the expectable income and expenses and of the possible risks. The danger of misleading investors was so obvious that Borenstein must have been aware of it. While he may well have been hopeful, indeed persuaded, that subsequent events would justify the financial condition he portrayed, it is beyond dispute that he had to be aware that the Prospectus portrait was a significant departure from the then existing reality.

Since the court finds that plaintiffs have proven scienter with respect to the 17(a)(1) and 10(b) counts, the culpability elements of the other claims are established *a fortiori*.

### 4. Plaintiffs' Reliance.

■ In order to sustain their burden of proof under § 17(a) and § 10(b) of the

---

**12.** Plaintiffs urge that scienter exists either when a defendant knows of the falsity of the information or acts in reckless disregard of whether or not the information is accurate or false, as well as when there is an intent to defraud. Those two standards are subsumed in the "reckless conduct" standard in *Sundstrand Corp.*

securities laws [13] plaintiffs have submitted sworn affidavits stating that they relied on the information [14] contained in the Prospectus in making their decisions to invest in Laurel Glen, Ltd. Defendant Borenstein has attempted to rebut the finding of reliance that could otherwise be drawn from the affidavits by pointing to the plaintiffs' deposition testimony which indicates that one of the motivating factors behind plaintiffs' investments was their desire to obtain a tax write-off during the 1975 tax year.

Defendant's argument is insufficient to defeat the clear showing of reliance. Initially, the court notes that although the deposition testimony evinces the fact that the tax consequences of the deal were an important feature of the investment to plaintiffs, it was not the sole motivating factor. Spatz' and Janda's testimony also indicates that the economic returns predicted for Laurel Glen, Ltd. also played a basis for their decisions. (See e. g., Spatz Dep. at 14, 34). Moreover, the notion that the tax consequences of the deal were the sole interests of the investors is contrary to common sense. As plaintiffs note, a real estate tax shelter is only attractive to investors because it offers "dual benefits"—a tax write-off and the opportunity to preserve or increase the invested capital. Were this not a fact real estate offerings in the Okeefenokee Swamp or the Mohave Desert would enjoy more popularity than they do now. Accordingly, the court finds that it is beyond reasonable dispute that the plaintiffs relied on the Prospectus and omissions.

### 5. Melnick's Liability to Plaintiffs as an Aider and Abetter.

Plaintiffs have sought to extend any liability established against Borenstein to his co-defendant, Melnick, on the grounds that the latter aided and abetted the fraud. In the court's opinion, plaintiffs have failed to establish on summary judgment that Melnick may properly be held so responsible.

▪ Plaintiffs correctly state that one may be held liable for securities fraud, as an aider and abettor, in the absence of any affirmative actions of that party. *Hochfelder v. Midwest Stock Exchange*, 503 F.2d 364, 374 (7th Cir. 1974). However, the limits of liability as an aider and abettor are quite circumscribed. In *Hochfelder*, the court stated:

> . . . investors must know that the party charged with aiding and abetting had knowledge of or, but for a breach of duty of inquiry, should have had knowledge of the fraud, and that possessing such knowledge the party failed to act due to an improper motive or breach of a duty of disclosure.

*Hochfelder v. Midwest Stock Exchange, supra* at 374.

▪ In the instant case, however, while plaintiffs may have demonstrated that Melnick knew of the inaccuracy or omissions of the Prospectus, this does not, under *Hochfelder*, complete the violation. Plaintiffs have failed to demonstrate that there is no genuine dispute that Melnick's failure to disclose the true facts to them was a result of any improper motive. Nor do plaintiffs assert any basis for imposing a compelling duty to disclose on Melnick. Spatz and Janda do not contend that Melnick was an issuer, seller or underwriter as defined by the Securities Act or the Exchange Act. As such, they have failed to demonstrate a basis for extending liability to this defendant.

### 6. · Summary of Findings and Appropriate Relief.

In conclusion, the court finds that plaintiffs have established on the basis of the record here that no genuine issue of fact remains with respect to the following: (1) that the Prospectus contained at least four

---

**13.** Reliance is not an element of a violation of § 12(2) of the Securities Act. *Sanders v. John Nuveen & Co., Inc., supra* at 1225.

**14.** Plaintiffs' reliance is, of course, presumed from the omissions, but not from affirmative

misrepresentations, *Sundstrand Corp. v. Sun Chemical Corp., supra* at 1050, unless plaintiffs are chargeable with knowledge of or "reckless ignorance" of the omissions.

false statements and failed to state at least three other facts necessary to make the Prospectus not misleading; (2) that at least five of these statements and omissions were material; (3) that Borenstein recklessly caused to be published to plaintiffs a Prospectus he knew contained material statements or omissions which were false or misleading; and (4) that plaintiffs relied on the misstatements or omissions.

Accordingly, on the basis of these conclusions, plaintiffs have established violations of § 12(2), § 17(a) and § 10(b) of the 1933 and 1934 Acts. They are entitled to relief against Borenstein.

■ In their motion, plaintiffs have asked for an order for rescission of their respective purchases of units in Laurel Glen, Ltd. together with the return from defendants of all consideration paid for these units, plus interest thereon. The securities laws clearly authorize such relief. *See e. g.*, § 12(2) ("[plaintiffs] may sue either at law or in equity . . . to recover the consideration paid for such security with interest thereon . . . .") This relief is granted against Borenstein.

### SUPPLEMENTAL MEMORANDUM AND ORDER

MORAN, District Judge.

Defendant, Joseph Borenstein, has requested the court to reconsider its Memorandum and Order of February 23, 1981 which granted summary judgment in favor of plaintiffs David Spatz and Charles Janda. On the basis of the arguments raised by defendant, some further discussion is appropriate and the prior memorandum has been modified slightly. That opinion is reissued, as revised, as of this date. Borenstein has not persuaded the court, however, that a change in the result reached in February is warranted.

In urging reconsideration, Borenstein has focused his attention on the interaction between the private offering exemption of § 4(2) of the Securities Act of 1933, Rule 146 of the Securities Exchange Commission and the application of the anti-fraud provisions of both the 1933 legislation and the Securities Exchange Act of 1934. On reconsideration, Borenstein concedes that the anti-fraud provisions of the securities laws apply to private offerings. He claims, however, "that because the plaintiffs had 'access to . . . information' and were 'given the opportunity to obtain any additional information', the total available information [afforded to Spatz and Janda by the offering at issue here] was not misleading or omitted and the Court erred in finding violations as a matter of law." (Def.Mem. at 3).

■ Primarily because it confuses or fails to distinguish two separate analytical concepts, Borenstein's argument fails on its face. Quite simply, access to information cannot alone affect the veracity of statements that are otherwise false. Nor can it make harmless omissions so material as to be otherwise fraudulent. Rather, the availability of information pertinent to the transaction may affect, in limited circumstances, the buyer's ability to claim *reliance* on the false statements or material omissions. Thus, Borenstein's claim that "because plaintiffs had 'access to . . . information' . . . the total available information . . . was not misleading" is a misstatement of the law.

■ Once the analytical concepts have been distinguished, what at first glance appears to be a complex issue raised on reconsideration, becomes relatively simple. That the placement memorandum contains false and misleading statements was established by the court's earlier opinion. Nothing suggested herein by Borenstein even remotely changes that result. The question, therefore, is whether the mere availability of access to additional information vitiates any reasonable reliance by Spatz and Janda on the misinformation conveyed by the Prospectus. It does not.

Contrary to Borenstein's claims, the available precedent does not present a clean slate on this issue. Rather, in *Sanders v. John Nuveen & Co., Inc.*, 619 F.2d 1222 (7th Cir. 1980), the Seventh Circuit addressed

the issue in the context of a public offering under § 12(2) of the 1933 Act. The panel stated:

Section 12(2) does not establish a graduated scale of duty depending upon the sophistication and *access to information of the customer. Hill York Corp. v. American International Franchises, Inc.,* 448 F.2d 680, 696 (5th Cir. 1971). A plaintiff under § 12(2) is not required to prove due diligence. *See e. g., Gilbert v. Nixon,* 429 F.2d 348, 356 (10th Cir. 1970). *All that is required is ignorance of the untruth or omission.*

*Sanders v. John Nuveen & Co., Inc., supra* at 1229 (emphasis added). Similarly, in the earlier case of *Sundstrand Corp. v. Sun Chemical Corp.,* 553 F.2d 1033 (7th Cir. 1977), the Court of Appeals noted that in non-disclosure cases, "reliance is vitiated if the plaintiff is chargeable with the omitted information." 553 F.2d at 1048. Moreover, since under *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), proof of scienter is required to establish a securities fraud, the *Sundstrand* court noted that " '[i]f contributory fault of plaintiff is to cancel out wanton or intentional fraud, it ought to be gross conduct somewhat comparable to that of defendant.' " 553 F.2d at 1048, *quoting, Holdsworth v. Strong,* 545 F.2d 687, 693 (10th Cir. 1976).

As in *Sundstrand,* there is nothing in the record on summary judgment to suggest that Spatz or Janda were "recklessly remiss" in not independently researching and verifying the statements in the placement memorandum. Nor does the record indicate or permit the inference that plaintiffs are chargeable with knowledge of the misrepresentations or omissions. All the record indicates is that perhaps additional (and, in certain respects, contradictory) information was available upon request. Plaintiffs' failure to avail themselves of this opportunity in the face of declarations in the placement memorandum was at best "negligent", and probably not even that.

Although Borenstein relies heavily on the fact that the Laurel Glen transaction was a private offering, this does not help him here. Assuming *arguendo* that the placement memorandum does qualify under § 4(2), the above analysis still applies. As noted in the court's previous opinion, § 4(2) and SEC Rule 146 do not diminish the reach of the anti-fraud provisions of the 1933 and 1934 Acts. Nor do they, in the abstract, either lower the standards necessary to attribute fault or recklessness to the buyer or independently create a heightened duty on the purchaser to investigate.

Rather, private offerings, necessarily made to sophisticated investors, permit alternative methods of full disclosure. The offeror may choose to present information in one document which approaches that which would be available in a registration statement or he may grant access to that information and invite the investor to satisfy himself. Still another alternative is to provide information respecting some aspects of the enterprise, advise the investor of those aspects about which the disclosure is incomplete or absent and invite the investor to satisfy himself. Having been advised in what respects the information presented is incomplete or absent and being invited to investigate, the private placement investor cannot complain that he reasonably relied upon a placement memorandum as providing full disclosure. In those circumstances it is incumbent upon him to investigate; he cannot remain purposefully ignorant.

But this is not this case. A recklessly inaccurate and incomplete placement memorandum cannot be used to gull and lull an investor, even should it appear, at least by hindsight, that prudence might have prompted a closer look. The private offering exemption does not license the offeror to draft his prospectus recklessly or fraudulently and then shield himself from liability by adding the caveat that additional information is available elsewhere on request.

In this light, Borenstein's reliance on *Doran v. Petroleum Management Corp.,* 545 F.2d 893 (5th Cir. 1977), is misplaced. Far from suggesting the result urged by defendant, *Doran* merely acknowledges that the availability of the 4(2) exemption de-

pends, in part, on the knowledge of potential investors and the availability of information to them. At most, *Doran* confirms that, given knowledgeable investors, the scope of required disclosure may be restricted. It does not suggest that purchasers of unregistered securities must independently verify those disclosures that have been made or that buyers of unregistered securities are entitled to only diminished protection against fraudulent statements or misleading omissions.

■ In conclusion, assuming the exemption of § 4(2) applied here, this provision would have limited the extent of information Borenstein was required to disclose and, concomitantly, restricted somewhat Spatz' and Janda's right to rely on the assumption that complete disclosure had been made. The private placement exemption did not, however, create an obligation on plaintiffs to verify independently every fact concerning the transaction, or more importantly, every fact disclosed by the placement memorandum. Moreover, the exemption did not make it possible for Borenstein to evade responsibility for misrepresentations or omissions in the Laurel Glen Prospectus solely by informing the offerees that additional information was available upon request. Consequently, the conclusions reached in the court's original memorandum are affirmed.

In his memorandum in support of its motion for reconsideration, Borenstein has raised, for the first time, an argument that recission is not a proper remedy in this case. Borenstein bases his claim on the fact that plaintiffs may reap a potential tax "windfall" if recission is ordered. The argument is wholly unpersuasive. While the court agrees with the proposition cited by Borenstein that "recission should not restore plaintiff to a better position than he would have been in had the fraud not occurred," *Rolf v. Blyth, Eastman, Dillon & Co., Inc.,* 570 F.2d 38, 49 (2d Cir. 1978), the maxim does not render the remedy unavailable. Recission would undo the transaction between the buyer and seller here. Obviously, any income received by plaintiffs from

the transaction must be disgorged in this process. The fact that plaintiffs may be better off vis-a-vis the government does not warrant the discarding of a remedy specifically enumerated by the Securities Act.

Accordingly, on reconsideration, the grant of summary judgment and recission in favor of plaintiffs and against defendant Borenstein is affirmed.