Richard A. **FRYMIRE, Kathleen Frymire-Brinati, and Michael Brinati, Plaintiffs,**

v.

**PEAT, MARWICK, MITCHELL & CO., Defendant.**

**No. 85 C 10460.**

United States District Court, N.D. Illinois, E.D.

March 26, 1987.

Michael J. Freed, Anthony C. Valiulis, Stewart M. Weltman, Much Shelist Freed Denenberg Ament & Eiger, P.C., Chicago, Ill., for plaintiffs.

Robert D. McLean, Michael J. Sweeney, Frank B. Vanker, Sidley & Austin, Chicago, Ill., for defendant.

## MEMORANDUM AND ORDER

MORAN, District Judge.

The facts and parties in this case broadly resemble those of *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). In *Ernst*, the plaintiffs invested in an allegedly fraudulent scheme. The perpetrator of the fraud was unavailable for suit (having committed suicide after bankrupting his company), and so the investors sued the auditors for securities fraud on the theory that the investors had

been misled by financial statements the auditors had approved. 425 U.S. at 189, 96 S.Ct. at 1378. Here the three plaintiffs, apparently related by blood or marriage, are stockholders in Pepco, Inc., an Oklahoma corporation, which apparently was in the business of selling interests in limited partnerships in real estate to persons seeking tax shelters. Both Pepco and its former president, Patrick Powers, are in bankruptcy and therefore are unavailable for suit. Plaintiffs thus bring this complaint against Pepco's auditors, defendant Peat, Marwick, Mitchell & Co. (PMM). PMM moves to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim, and Federal Rule of Civil Procedure 9(b) for failure to plead fraud and conspiracy to defraud with particularity.

The 42–page complaint consists of six counts. Count I is under § 12(2) of the Securities Act of 1933, 15 U.S.C. § 77*l* (2); count II under § 17(a) of the same Act, 15 U.S.C. § 77q(a); count III under § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Securities Exchange Commission (SEC) Rule 10b–5, 17 C.F.R. § 240.10b–5; count IV, a claim for treble damages under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961 *et seq.* Counts V and VI are pendent Illinois law claims for common law fraud and negligent misrepresentation, respectively.

## I.

■ PMM moves to dismiss count I because it is not a proper defendant to a § 12(2) action. That section, it contends, imposes liability only on sellers of securities, a liability which runs only to persons who purchased the security from them. *Sanders v. John Nuveen & Co.,* 619 F.2d 1222, 1226 (7th Cir.1980), *cert. denied,* 450 U.S. 1005, 101 S.Ct. 1719, 68 L.Ed.2d 210 (1981); *Collins v. Signetics Corp.,* 605 F.2d 110, 113 (3d Cir.1979). Plaintiffs counter by arguing that experts such as auditors hired to perform services and to express opinions can be liable under § 12(2) for "aiding and abetting" the perpetrator of the fraud.

This circuit simply does not recognize such liability for § 12(2). The existence of aiding and abetting liability is in some doubt even for the far more well established Rule 10b–5 action. *Herman & MacLean v. Huddleston,* 459 U.S. 375, 379 n. 5, 103 S.Ct. 683, 685 n. 5, 74 L.Ed.2d 548 (1983); *Congregation of the Passion, Holy Cross Province v. Kidder Peabody & Co.,* 800 F.2d 177, 183 (7th Cir.1986). The *Holy Cross* court, 800 F.2d at 183, identified *Barker v. Henderson, Franklin, Starnes & Holt,* 797 F.2d 490 (7th Cir.1986), as the major recent opinion in this circuit on aiding and abetting. *Barker* not only does not mention aiding and abetting for § 12(2), but expressly says that to be liable under that section an accounting firm must have been an issuer, director, offeror or seller of securities, or a signatory of a prospectus, or a person with the ability to direct the actions of persons who were. 797 F.2d at 494. Moreover, even those circuits which do impose § 12(2) aiding and abetting liability nevertheless limit it to those who actively participated in a sale, *e.g.,* through solicitations or a role in negotiations. *In re Diasonics Securities Litigation,* 599 F.Supp. 447, 457 (N.D.Cal.1984). None of those descriptions fit PMM here. Count I is dismissed.

## II.

■ PMM defends against count II first of all by arguing that there is no private right of action under § 17(a), and alternatively that even if there is, only sellers can be defendants under it. Plaintiffs remind this court that we held some time ago that private rights of action exist under all three subsections of § 17(a). *Spatz v. Borenstein,* 513 F.Supp. 571, 576 (N.D.Ill. 1981). However, that holding rested on our reading of Seventh Circuit precedents at that time, which we thought had squarely concluded in favor of a private right of action under § 17(a). Since then, three different panels of this circuit have stated that the existence of the private action is an open question. *Ray v. Karris,* 780 F.2d 636, 641 n. 3 (7th Cir.1985); *Teamsters Local 282 Pension Trust Fund v. Angelos,* 762 F.2d 522, 530 (7th Cir.1985); *Peoria*

*Union Stock Yards Company Retirement Plan v. Penn Mutual Life Insurance Co.,* 698 F.2d 320, 323 (7th Cir.1983). As a result, a division of opinion has emerged within this district. *Compare Beck v. Cantor, Fitzgerald & Co.,* 621 F.Supp. 1547, 1559–1560 (N.D.Ill.1985) *with Onesti v. Thomson McKinnon Securities, Inc.,* 619 F.Supp. 1262, 1266–1267 (N.D.Ill.1985).

This case also presents, as *Spatz* did not, the question of the appropriate standard of federal securities law liability for providers of services and opinions, such as auditors. In *Ernst,* the Supreme Court held that securities fraud victims could not recover damages from an auditing firm in a Rule 10b–5 action without proof of *scienter.* The court concluded that Congress, in passing the securities laws, intended to establish different standards of liability for different types of defendants in different circumstances and, further, that mere providers of services and opinions should ordinarily have less exposure to liability than issuers and sellers of securities. 425 U.S. at 200, 208. For example, under § 11(b)(3) of the Securities Act of 1933, 15 U.S.C. § 77k(b)(3)(B), issuers of securities are strictly liable for misleading errors in a registration statement. Accountants, however, are liable only for their negligence.

For the review of financial statements, even more protection from liability seemed appropriate. An issuer out to perpetrate a fraud could defraud auditors as well as investors. Thus one factor in the court's decision in *Ernst* was a belief that liability for mere negligence under § 10(b) and Rule 10b–5, which had already been determined to reach providers of services and opinions like auditors, would expose them to far more liability more often than Congress had intended. *Id.,* 425 U.S. at 211–212 n. 31, 214–216 n. 33, 96 S.Ct. at 1389–1390 n. 31, 1391 n. 33. A standard of liability which required proof of intent, knowledge or recklessness was more in keeping with the statutory scheme.

A possible application of § 17(a) to auditors presents the same problem. The Supreme Court has determined in the context of an SEC action that while § 17(a)(1) re-

quires proof of *scienter,* a negligence standard applies to § 17(a)(2) and § 17(a)(3). *Aaron v. SEC,* 446 U.S. 680, 697, 100 S.Ct. 1945, 1956, 64 L.Ed.2d 611 (1980). Plaintiffs' count II includes a claim under § 17(a)(3), which provides:

> It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly, … to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

The language of the subsection is thus very similar to subsection (c) of Rule 10b–5. If the standard of liability for § 17(a)(3) is negligence, and if a private action exists under it which runs to auditors, then securities fraud plaintiffs will be able, through a different route, to reach nearly the same result which the *Ernst* court concluded was neither intended by Congress nor within the proper scope of federal securities laws.

The Fifth Circuit has made an extensive analysis of both the statute and its legislative history. *Landry v. All American Assurance Co.,* 688 F.2d 381, 384–391 (5th Cir.1982). That court concluded both that Congress never intended a private right of action under any subsection of § 17(a), and that an action based on mere negligence "would effectively frustrate [Congress'] carefully laid framework" for securities fraud. *Id.* at 391; *see also Beck,* 621 F.Supp. at 1560. The question of using § 17(a)(3) against a provider of services or opinions has not been before the Seventh Circuit. In each case where the Seventh Circuit has appeared to allow a private action under § 17(a), the claim in question actually required proof of *scienter,* so that it had essentially the same elements as a 10b–5 action and "add[ed] nothing to plaintiff's arsenal." *Peoria Union,* 698 F.2d at 323; *see Angelos,* 762 F.2d at 530–531. Thus this circuit has never authorized use of § 17(a) to expand federal securities liability. Moreover, the court's treatment of the subject in *Angelos* suggests that it would not.

If PMM is correct in reading § 17(a) to apply only to sellers, of course, then the problem of a sweeping federal negligence action against auditors does not appear. There is some justification for their position in the statutory language. § 17(a) says *"in the offer* or sale of any securities," as opposed to § 10(b)'s and Rule 10b–5's mere "in *connection with* the purchase or sale" (emphasis added). Also, the *Aaron* court commented that § 17(a) "applies only to sellers." 446 U.S. at 687, 100 S.Ct. at 1950. Although the context of the court's opinion makes it clear that the court was there contrasting § 17(a) with Rule 10b–5's application to both buyers and sellers, nevertheless the choice of the word "offer" does seem to suggest a limitation to sellers. *See also SEC v. First Financial Group of Texas,* 645 F.2d 429, 436 n. 12 (5th Cir.1981). This court is certain of only one thing: we do not see how we could approve a § 17(a)(3) action against PMM here without undermining the holding of, and policies expressed in, *Ernst.* Either because we were wrong in *Spatz* to conclude that a private action exists under § 17(a), or because that action is limited to sellers, or both, count II must also be dismissed.

### III.

■ PMM does not argue that count III fails to state a Rule 10b–5 claim or that count V does not state a claim for common law fraud. Rather, it contends that plaintiffs have not met the Rule 9(b) standards for pleading fraud. This court disagrees. Rule 9(b) does not impose a duty of extensive discovery on a plaintiff before that plaintiff has access to discovery. *Morgan v. Kobrin,* 649 F.Supp. 1023, 1028 (N.D.Ill. 1986). Rather, Rule 9(b) must be read together with Fed.R.Civ.P. 8, which encourages a short and plain statement of the claim. *Id., citing Tomera v. Galt,* 511 F.2d 504, 508 (7th Cir.1975). What the rule requires is a sketch of the scheme: how it operated, the nature of the misleading statements or omissions, when or where they were made, and a defendant's specific relation to the scheme. *Tomera,* 511 F.2d

at 508–509. Plaintiffs have met that requirement.

■ The standard for Rule 9(b) varies somewhat depending on the nature of the scheme alleged and the type of party or parties being sued. *Kobrin,* 649 F.Supp. at 1028. In particular, a provider of services and opinions such as an accounting firm, which may itself have been taken in by the scheme and which has a reputation to protect, may fairly demand a higher level of specificity in the pleadings than an issuer in order to reduce the number of groundless claims against it. *In re Commonwealth Oil/Tesoro Petroleum Securities Litigation,* 467 F.Supp. 227, 250, *later proceeding* 484 F.Supp. 253 (W.D.Tex.1979). For example, when the documents provided by such persons appear neutral on their face, a court may reasonably require that plaintiffs plead some facts from which an inference of *scienter* can be drawn. *McKee v. Pope Ballard Shepard & Fowle, Ltd.,* 604 F.Supp. 927, 931 (N.D.Ill.1985). The standard for *scienter* in this circuit is knowledge or recklessness. *Sundstrand Corp. v. Sun Chemical Corp.,* 553 F.2d 1033, 1044 (7th Cir.), *cert. denied,* 434 U.S. 875, 98 S.Ct. 224, 225, 54 L.Ed.2d 155 (1977).

■ On the other hand, when plaintiffs complain that defendants omitted or concealed information, obviously they cannot and need not list the concealed information with great precision, or list every document which might have contained an omission. *Thomas v. Tramiel,* 105 F.R.D. 568, 573 (E.D.Pa.1985). Instead, plaintiffs need only plead enough facts to give the claim substance: the type of facts they believe were omitted, the type of document in which they should have appeared, and the way in which their omission made the documents misleading. *Id.* at 572; *Commonwealth Oil,* 467 F.Supp. at 252, 255.

Plaintiffs here have done all that. The scheme as plaintiffs outline it turned on the existence of Pepco Mortgage Co., Inc. (PMCI), which Powers owned and controlled. Funds collected from investors ostensibly for limited partnerships allegedly were instead loaned to PMCI, which in turn

loaned them to those partnerships which were in poor financial health, or to Powers himself and entities or persons he controlled. Roughly two-thirds of the assets of Pepco during the years in question here consisted of promissory notes from PMCI. Plaintiffs charge that those notes were largely worthless and uncollectible because the loans that PMCI had made were largely worthless and uncollectible. In effect, money from investors in the limited partnerships became the pea in a shell game, appearing to be in Pepco, in PMCI, and in the limited partnerships all at the same time.

■ For plaintiffs' claim against PMM, then, the omitted facts are the existence of PMCI, the worthlessness of PMCI's notes as assets of Pepco, and the way Powers was using PMCI to inflate the balance sheets of his various operations (complaint, ¶¶ 40–46). The documents in which these facts should have appeared are the three financial statements which PMM audited for Pepco covering the years 1981, 1982 and 1983 (¶¶ 10, 39). The way in which the omissions worked to mislead was to make Pepco appear far stronger financially than it actually was, thus encouraging persons like plaintiffs to buy or retain stock in it (¶ 38). Plaintiffs further allege that PMM either knew of or recklessly disregarded the existence of PMCI and the way Powers used it, the worthlessness of its notes to Pepco, and various other manipulative recordkeeping and accounting devices, as indicated by letters from PMM personnel and PMM audit work papers unearthed in the investigation of Pepco by Oklahoma state securities fraud investigators (¶¶ 40–46). In addition, PMM acquiesced in Pepco's use of the allegedly misleading equity method of accounting for certain assets (¶¶ 41, 43–44). Despite this alleged knowledge or recklessness, PMM unqualifiedly approved the financial statements. Thus PMM became part of Powers' fraudulent scheme. PMM points out that the statements showed 60% or more of Pepco's assets as loans to "Related Entities." But whether that was sufficient disclosure under the circumstances is of course not something this court can decide on a motion to dismiss. The question is whether plaintiffs have fairly put PMM on notice of the nature of their claim and have alleged enough facts to sketch out the elements of a fraud claim against PMM as well as Powers. They have. Counts III and V survive PMM's motion.

## IV.

■ However, PMM has good grounds for demanding greater particularity in the pleadings for count IV, the RICO count. Rule 9(b) pleading standards apply to claims of fraud brought under the RICO statute, and the elements of a RICO claim differ substantially from those of ordinary fraud. *See generally H.C. Gallimore, Inc. v. Abdula*, 652 F.Supp. 437 (N.D.Ill.1987) (reviewing requirements for pleading a RICO claim). Rule 9(b) still requires no more than a sketch, but the sketch must indicate that the defendant violated RICO.

Plaintiffs allege in count III that PMM was both directly liable as a knowing or reckless participant in Powers' fraudulent scheme, and vicariously liable as a conspirator with Powers. There is a difference between those two liabilities. *See, e.g., Jernryd v. Nilsson*, No. 84 C 7551, slip op. at 12, 17, 20–21 (N.D.Ill. Dec. 3, 1986) [Available on WESTLAW, DCTU database]. In particular, one can commit securities fraud recklessly, but one must agree to conspire. *See United States v. Gabriel*, 810 F.2d 627, 634 (7th Cir.1987). The difference did not affect our result on count III since plaintiffs have adequately alleged direct liability in that count. For RICO, however, plaintiffs have asserted only vicarious liability against PMM on a theory of violation of 18 U.S.C. § 1962(d), a conspiracy to violate RICO.

■ Plaintiffs have failed to meet the standard for pleading a conspiracy. A complaint which merely implies, with the conclusory allegation of a conspiracy, that a defendant is responsible for someone else's fraudulent acts is insufficient. *Adair v. Hunt International Resources Corp.*, 526 F.Supp. 736, 745 (N.D.Ill.1981). Any plaintiff alleging conspiracy must

identify the nature of the conspiracy and the defendant's role in it with some particularity. *Commonwealth Oil*, 467 F.Supp. at 252, 484 F.Supp. at 269. Above all, since conspiracy rests on agreement, the plaintiff must allege with some particularity facts sufficient to show an agreement between the parties to inflict the alleged wrong. *Koch v. Schneider*, 550 F.Supp. 846, 850 (N.D.Ill.1982).

Moreover, even one who agrees to a conspiracy to defraud does not thereby necessarily conspire to violate RICO. *Otto v. Variable Annuity Life Insurance Co.*, 814 F.2d 1127, 1137 (7th Cir.1986) (dismissing RICO conspiracy count although complaint stated claim for a securities fraud conspiracy). Alleging a conspiracy to violate RICO requires particularity for what can be best described analytically as two agreements: one to a pattern of racketeering activity as defined by the statute, and another to the statutorily proscribed conduct. *See United States v. Neapolitan*, 791 F.2d 489, 498–499 (7th Cir.), *cert. denied*, 479 U.S. ——, 107 S.Ct. 422, 93 L.Ed.2d 372 (1986). To be found a conspirator, a defendant need not himself do the predicate acts necessary to support a pattern of racketeering activity, but he must agree to someone's doing such acts on behalf of the conspiracy. *Id.* at 498. Further, he must agree to one of the uses or effects of that pattern of racketeering activity which the statute expressly prohibits: either taking income from a pattern of racketeering activity and using it in an enterprise, 18 U.S.C. § 1962(a), or acquiring or maintaining an interest in or control over an enterprise through a pattern of racketeering activity, 18 U.S.C. § 1962(b), or conducting the affairs of an enterprise through a pattern of racketeering activity, 18 U.S.C. § 1962(c). *Id.* at 497, 499.

Plaintiffs do not allege that PMM violated RICO through its own acts. There is no indication that PMM made fraudulent mailings or phone calls to plaintiffs. Moreover, the enterprise which plaintiffs allege for RICO purposes is Pepco (¶ 83). PMM did not invest in or control Pepco, nor do plaintiffs allege that when employed by Pepco PMM participated in its affairs through a pattern of racketeering activity. Thus any RICO liability could only be vicarious, through an agreement to join a conspiracy which would violate RICO. But plaintiffs tell us only what Powers did, not what PMM agreed to have him do. Powers is charged with making fraudulent phone calls and mailings (¶ 85), but there are no facts which support PMM's agreement to his making those calls or mailings. Plaintiffs contend that Powers violated subsections (a), (b) and (c) of § 1962 (¶ 88), but we cannot determine from the complaint which of those sections PMM supposedly agreed to violate, let alone find facts which would support such an agreement. *Cf. Papai v. Cremosnik*, 635 F.Supp. 1402, 1405 (N.D. Ill.1986). Nor is it immediately obvious how one might infer such an agreement from PMM's other alleged conduct. It is not impossible to state a RICO claim against accountants, *see id.* at 1404, 1413 (preparer of financial statement), but plaintiffs have not managed to do so here. PMM is entitled to more notice of how it supposedly agreed to expose itself to treble damages than plaintiffs have provided. Count IV is dismissed with leave to amend.

## V.

Count VI is a pendent claim for negligent misrepresentation. The parties agree that it is governed by Illinois law. Plaintiffs allege that PMM "knew or should have known that investors in Pepco, Inc. would review and rely on the financial statements certified by PMM," especially since PMM expressly allowed Pepco to include the 1982 and 1983 statements in its annual report (¶ 94). Plaintiffs contend that since they are within the class of investors, PMM owed them a duty which it breached by negligently certifying inaccurate and misleading statements.

Negligently supplying false information for the guidance of others in business transactions is within the scope of the tort of negligent misrepresentation in Illinois. *Zurad v. Lehman Brothers Kuhn Loeb, Inc.*, 757 F.2d 129, 133–134 (7th Cir.1985).

However, before any action in negligence will lie, the defendant must owe a legal duty to the plaintiff under the facts and circumstances of the case. In determining whether the law imposes a duty in that situation, the court must balance the foreseeability of the occurrence, the likelihood that the occurrence will lead to injury, the magnitude of the burden of guarding against such injury, and the consequences of placing that burden on the defendant. *See generally First National Bank of Dwight v. Regent Sports Corp.*, 619 F.Supp. 820, 823–824 (N.D.Ill.1985), *aff'd*, 803 F.2d 1431, 1438 (7th Cir.1986).

PMM argues that Illinois law imposes no generalized duty on a firm's auditors that runs in favor of potential investors in such a firm. In *Brumley v. Touche Ross & Co.*, 123 Ill.App.3d 636, 642, 463 N.E.2d 195, 200, 79 Ill.Dec. 57, 62 (2d Dist.1984) (*Brumley I*), the court dismissed a claim similar to the one here by an investor who had lost some $2,500,000 in his purchase of two-thirds of the stock of a corporation. He had alleged that the accounting firm which had audited the company had a duty extending to all potential investors, since it was foreseeable that the company would submit the audit report to persons in that class. The court held that an auditor owed a duty to a third party only if it knew that its client intended to use its opinions for the benefit of or to influence that third party. PMM concludes that it owed no duty to anyone except its client, unless at the time it put the reports together it knew it was preparing reports for a third person at the express direction of its client.

An auditor's duty in Illinois is not quite as limited as PMM suggests. The *Brumley I* plaintiff returned to the same court a year later with an amended complaint. In it he alleged that when the corporation had given him the audit reports he had contacted the accounting firm to inform them that he was considering a major stock purchase in reliance on the reports, and the firm then verified their accuracy to him. The court upheld the amended complaint, say-

ing that a duty to the investor arose when the accounting firm knew that its client was using the report to influence him and in effect consented to that use, though not before. *Brumley v. Touche Ross & Co.*, 139 Ill.App.3d 831, 836, 487 N.E.2d 641, 645, 93 Ill.Dec. 816, 820 (2d Dist.1985) (*Brumley II*). Thus in some circumstances a duty could arise after the financial statements were certified. Nevertheless, *Brumley I* and *Brumley II* both indicate that in Illinois an auditor's liability for misinformation negligently appearing in a financial statement runs primarily to his client. He owes a duty to others only if the client uses the statement to influence a third party and the auditor knows of that use, and perhaps also only if the auditor acts in such a way that the third party reasonably could conclude that a representation had been made to him as well as to the client. If so, plaintiffs' allegations of liability to investors generally are obviously inadequate.

Plaintiffs rightly point out that, strictly speaking, this court is not bound by decisions of the Illinois appellate courts. Rather, in determining state law, we should seek to predict how the Illinois Supreme Court would rule on the issue. *Barr Co. v. Safeco Insurance Co. of America*, 583 F.Supp. 248, 252–254 (N.D.Ill.1984). Therefore, plaintiffs contend that we can find *Brumley I* and *Brumley II* wrongly decided. The difficulty with that argument is that we find no solid indication in Illinois Supreme Court decisions that the cases were wrongly decided.

That court has obviously given the factor of the consequences of imposing a duty on the defendant substantial weight in its analysis of similar problems. For example, in *Rozny v. Marzul*, 43 Ill.2d 54, 62, 68, 250 N.E.2d 656, 660, 663 (1969), the court held that a plaintiff damaged by misinformation from an expert could sue the expert despite lack of privity with him, and that a surveyor who prepared an inaccurate plat survey for a developer was liable to the purchaser of the lot for the cost of moving the house

and garage the purchaser had built on it. But the court also emphasized that the scope of duty for such experts was limited. In those circumstances it had been influenced to find a duty in particular by two things. First, the surveyor had extended an "absolute guarantee for accuracy" in his survey, which was the type of statement likely to encourage reliance by third parties. *Id.* at 66, 250 N.E.2d at 662. Second, in the case of a plat survey, potential liability was restricted to a relatively small class of purchasers or lenders, with injury ordinarily occurring only once, to the one person who bought the lot. *Id.* at 66–67, 250 N.E.2d at 662–663. Thus an expert's duty to anyone other than a client arises only when a potential number of victims and injuries is quite small, preferably one each, and only when the expert affirmatively took a step likely to lead to reliance by such a victim.

Later decisions on the scope of an attorney's duty to persons not his clients have been entirely consistent with that narrow approach. In *Pelham v. Griesheimer*, 92 Ill.2d 13, 440 N.E.2d 96, 64 Ill.Dec. 544 (1982), children who had been dropped as beneficiaries from their father's life insurance policy after a divorce, sued the attorney who had represented their mother in the divorce. The court held that the attorney could not be liable because he owed no duty to the children. 92 Ill.2d at 19, 440 N.E.2d at 99, 64 Ill.Dec. at 547. His duty extended only to persons who could reasonably argue that they were intended third-party beneficiaries of the attorney-client relationship, *i.e.*, only if the client directed the attorney to act for the benefit of or to influence that third party. *Id.* at 20–21, 440 N.E.2d at 100, 64 Ill.Dec. at 548. In the case before it, it found that the attorney had been hired primarily to obtain a divorce, property settlement, and custody for the mother, not to benefit the children. *Id.* at 23, 440 N.E.2d at 101, 64 Ill.Dec. at 549. Thus, for example, the Supreme Court has held that the beneficiaries whom a client expressly names in a will are within the class of persons to whom an attorney owes a duty in tort. *Ogle v. Fruiten*, 102 Ill.2d 356, 363, 466 N.E.2d 224, 227, 80 Ill.Dec. 772, 775 (1984). But an attorney who had given investment advice to two principals of a closely held corporation owed no duty to their wives, even though the advice required the wives to assume legal obligations as co-signers on second mortgages of the homes they held jointly with their husbands, and to negotiate homestead exemptions. *York v. Stiefel*, 99 Ill.2d 312, 320–321, 458 N.E.2d 488, 493, 76 Ill.Dec. 88, 93 (1983).

The *Brumley I* and *Brumley II* decisions, in tightly limiting the scope of an auditor's duty, follow logically from this line of Illinois Supreme Court cases. While the potential liability of experts is not limited to those with whom the expert is in privity, nevertheless it is narrowly defined by the client's instructions and the uses to which the client expressly indicates the information will be put. In general, the opinions indicate a strong reluctance to impose a duty on an expert unless he acted in such a way as to assume that duty, at least implicitly. *Merit Insurance Co. v. Colao*, 603 F.2d 654 (7th Cir.1979), *cert. denied*, 445 U.S. 929, 100 S.Ct. 1318, 63 L.Ed.2d 763 (1980), on which plaintiff relies, is not to the contrary. There the court held that an insurer which underwrote another company's policies could sue the accounting firm which had approved the company's financial statement for negligent misrepresentation. But the auditors had known that the statement was being prepared to be shown to insurers in the hope of attracting an underwriter. Thus, while the auditors did not know the insurer by name, they knew that the statement would go to a limited class of persons, only one of whom would be injured by misinformation, and in circumstances which would encourage reliance. 603 F.2d at 659.

Here, by contrast, plaintiffs have not alleged that Pepco directed PMM to approve a financial statement expressly to lure investors, nor are investors in general (as opposed to the one major investor seeking

control of the company in *Brumley II*) a limited class of persons, only one of whom is likely to be injured by misinformation. While Illinois law will impose a duty on auditors which extends beyond their immediate client in some situations, the scope of that duty is not broad and it does not extend to investors in general as plaintiffs allege. We are aware, as plaintiffs point out, that other jurisdictions impose wider duties on auditors. But the Illinois courts have presumably restricted the potential liability of experts arising from their giving of information or opinions for considered policy reasons which a federal court should not second-guess. Count VI must be dismissed.

## VI.

Defendants also raise statute of limitation objections to the claims of Richard Frymire under § 12(2) and RICO. In fraud cases, where equitable tolling is so often a factor, this court is unlikely to dispose of a claim on limitation grounds unless the complaint on its face clearly shows that the claim is time-barred. *Kobrin,* 649 F.Supp. at 1027. But in any case, the § 12(2) and RICO claims have already been dismissed for other reasons. PMM also attacks Frymire's Rule 10b–5 claim on the ground that he cannot have relied on the 1982 and 1983 year-end financial statements for purchases made in 1981 and 1982. Frymire contends that he would have sold his interests in Pepco if he had known its true financial state in those years. There are serious problems with a claim based on a "lost opportunity" to buy or sell. *See Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 746, 95 S.Ct. 1917, 1930, 44 L.Ed.2d 539 (1975); *Wittenberg v. Continental Real Estate Partners, Ltd.,* 478 F.Supp. 504, 510 (D.Mass.1979), *aff'd,* 625 F.2d 5 (1st Cir.1980). However, Frymire does allege transactions in 1982 at a point where he could have relied on the 1981 statement, so he still may have a claim. We leave the precise definition of it for another day.

## CONCLUSION

Defendant's motion to dismiss is granted as to counts I, II, IV and VI of the complaint, but denied as to counts III and V.