ALAN ROSENSTEIN, on Behalf of Himself and Other Persons Similarly Situated, Plaintiff-Appellant, v. STANDARD AND POOR'S CORPORATION, Defendant-Appellee.

First District (3rd Division)   No. 1—91—3000

Opinion filed May 26, 1993.—Rehearing denied June 21, 1993.

Marshall Patner, Jeremy W. Hobbs, and David I. Hurwitz, all of Marshall Patner & Associates, P.C., Arne R. Rode, and Peter B. Shaeffer; all of Chicago, for appellant.

Robert G. Krupka, P.C., and Constance R. Lindman, of Kirkland & Ellis, of Chicago, for appellee.

JUSTICE GREIMAN delivered the opinion of the court:

Alan Rosenstein (plaintiff) seeks reversal of the trial court's order dismissing with prejudice his complaint alleging negligent misrepresentation by Standard & Poor's (S&P) in incorporating an erroneous closing price of a particular stock in the Standard & Poor 100 and Standard & Poor 500 Indexes that established the sale price of plaintiff's option contracts.

S&P and the Chicago Board Options Exchange (CBOE) entered into a licensing agreement whereby S&P was the official source for calculating and disseminating the closing values of the S&P Indexes for the purpose of trading securities options. The settlement value of these options is the closing value of the indexes reported by S&P to the Options Clearing Corporation (OCC) following the close of trading on the Friday before the expiration date of the options. The OCC settles traders' options automatically. Plaintiff held 241 option contracts with the CBOE that were settled on December 15, 1989, the value determined by the reported S&P Indexes, and sought to recover his "losses" and those of the putative class members holding option contracts.

We affirm the trial court because S&P's liability has been expressly exculpated by the terms of the license agreement between S&P and the CBOE, and incorporated into the rules of the CBOE, which regulate plaintiff's transactions.

In the licensing agreement, to which sales are subject, S&P agreed to correct "inaccuracies in the S&P indexes within the control of S&P which are discovered by S&P or brought to its attention." Plaintiff's complaint, however, does not allege this provision of the agreement.

The complaint does set out the exculpatory clause included in the agreement:

"S&P shall obtain information for inclusion in or for use in the calculation of the S&P Indexes from sources which S&P considers reliable, but S&P does not guarantee the accuracy and/or the completeness of any of the S&P Indexes or any data included therein. S&P MAKES NO WARRANTY, EXPRESS OR IMPLIED, AS TO RESULTS TO BE OBTAINED BY ANY PERSON OR ANY ENTITY FROM THE USE OF THE S&P INDEXES OR ANY DATA INCLUDED THEREIN IN CONNECTION WITH THE TRADING OF THE CONTRACTS, OR FOR ANY OTHER USE. S&P MAKES NO EXPRESS OR IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE FOR USE WITH RESPECT TO THE S&P INDEXES OR ANY DATA INCLUDED THEREIN. CBOE Rules shall expressly include the disclaimer language contained in this Paragraph 12(c)."

On the last day of trading before the expiration of December options on Friday December 15, 1989, at 3:12 p.m., the New York Stock Exchange (NYSE) reported an inaccurate closing price for Ford Motor Company stock, one of the stock prices used by S&P to calculate its indexes. At 3:15 p.m., the NYSE reported a corrected closing price for Ford stock.

Plaintiff's complaint alleges S&P contracted with Automated Data Processing (ADP) to compute the indexes based upon price information received from the NYSE and that ADP received timely notice of the inaccuracy from the NYSE but failed to correct it. Had the corrected price been used to calculate the indexes, plaintiff apparently would not have lost $3,225 upon settlement of his options contracts by the OCC, which relied upon the index values as reported by S&P. S&P corrected the values on Monday, December 18, 1989, but this was after plaintiff, and others holding 92,000 option contracts, had settled the contracts using the earlier-reported values.

Plaintiff's complaint alleged that S&P negligently misrepresented the closing values of the two indexes, causing plaintiff and the class to suffer harm upon settlement of options traded under a licensing agreement with S&P.

The trial court granted S&P's section 2—615 motion to dismiss with prejudice on the grounds that plaintiff did not and could not state a cause of action for negligent misrepresentation because plaintiff did not and could not plead any duty owed by S&P to plaintiff and plaintiff took no action in reliance of information disseminated by S&P.

A section 2—615 motion addresses defects on the face of a pleading, admitting all well-pleaded facts and attacking facially only the complaint's legal sufficiency. (*Aguilar v. Safeway Insurance Co.*

(1991), 221 Ill. App. 3d 1095, 1100, 582 N.E.2d 1362.) In reviewing an order of dismissal, a reviewing court must determine whether the allegations of the complaint, when interpreted in the light most favorable to the plaintiff, are sufficient to set forth a cause of action upon which relief may be granted. *Burdinie v. Village of Glendale Heights* (1990), 139 Ill. 2d 501, 505, 565 N.E.2d 654.

The first issue for consideration in any negligence case is whether the trial court properly determined if defendant owed a duty to plaintiff as a matter of law. *Dunn v. Baltimore & Ohio R.R. Co.* (1989), 127 Ill. 2d 350, 365, 537 N.E.2d 738; *Trucco v. Walgreen Co.* (1991), 219 Ill. App. 3d 496, 498, 579 N.E.2d 1018.

■ To state a cause of action for negligent misrepresentation, plaintiff must plead and prove: (1) a false statement of material fact; (2) carelessness or negligence in ascertaining the truth of the statement by defendant; (3) an intention to induce the other party to act; (4) action by the other party in reliance on the truth of the statements; (5) damage to the other party resulting from such reliance; and (6) a duty owed by defendant to plaintiff to communicate accurate information. *Board of Education v. A,C&S, Inc.* (1989), 131 Ill. 2d 428, 452, 546 N.E.2d 580.

Plaintiff argues that his cause of action is not for a breach of a guarantee of accuracy or a warranty of merchantability or fitness for a particular purpose, but rather for a breach of S&P's duty to use due care in calculating and disseminating index values which it knew were going to be used by the OCC for automatic settlement of options contracts.

Plaintiff contends that S&P licensed the indexes knowing traders would rely on the values in the automatic settlement of their contracts and specifically warranted a prompt correction of any inaccuracies, thus creating a duty to plaintiff and his class. Plaintiff argues that the disclaimer does not address S&P's duty to use due care in calculating and disseminating closing index values.

S&P responds by denying that the obligation to provide information creates a duty to the plaintiff or other traders; that it is a publisher protected by the first amendment; that S&P Indexes are merely the products of its editorial judgment rather than misrepresented facts; that plaintiff did not act in reliance upon S&P Index values reported by S&P; that plaintiff may not sue in tort for disappointed commercial expectations; and that plaintiff purchased S&P Index options to be determined by S&P and that he therefore received that for which he bargained.

Finally, S&P also asserts that the license agreement which is the basis for its purported liability is limited by the exculpatory clause which is set out in the complaint.

Plaintiff's complaint alleges that S&P compiles and publishes the indexes and licenses them to the CBOE. The CBOE, pursuant to the agreement, designates S&P as the official source for calculating and disseminating closing index values.

In considering S&P's duty to plaintiff, we first examine Justice Cardozo's opinion in *Glanzer v. Shepard* (1922), 233 N.Y. 236, 135 N.E. 275. Plaintiff contracted to pay a third party according to the actual weight of the beans as determined by defendant bean weigher. The bean weigher had negligently misrepresented the actual weight of the beans and was held to owe a duty to plaintiff and reimburse him for losses based upon the incorrect weight.

Plaintiff claims, and we tend to agree, that compilation is merely a sophisticated version of bean weighing.[1]

In 1969, our supreme court considered the policy decision in *Glanzer* and determined that one who negligently supplies inaccurate information to one who relies upon such information would be liable if use of the information was foreseeable, if defendant knew the information would be used and relied upon by persons other than those in privity with him, and if the potential liability was restricted to a comparatively small group. *Rozny v. Marnul* (1969), 43 Ill. 2d 54, 250 N.E.2d 656 (surveyor liable to third persons for inaccuracies in survey).

Having established the tort of negligent misrepresentation, *Moorman Manufacturing Co. v. National Tank Co.* (1982), 91 Ill. 2d 69, 435 N.E.2d 443, provided scope and focus for the pursuit of such litigation in Illinois. *Moorman* held that disappointed commercial expectations could be redressed only in an action sounding in contract rather than in tort.

The supreme court was anxious that parties not circumvent contractual remedies when seeking recovery for economic losses; however, the exceptions noted by *Moorman* were actions for fraudulent misrepresentations or negligent misrepresentation against one

---

[1]*Standard & Poor's Corp. v. Commodity Exchange, Inc.* (2d Cir. 1982), 683 F.2d 704, 710, provides us with some understanding as to the complexity of S&P's development of its indexes; the court observed that "[t]he evidence in the present case shows that S&P exercises its expertise first by choosing the 500 stocks to be included in its index and then by assigning the weights to be given each stock. To assure the accuracy and integrity of the Standard & Poor's 500 Index, S&P uses 25-30 analysts and a staff of twelve chartists and statistical clerks. The S&P manager responsible for calculating the index for the past twelve years testified that even he would be unable to calculate the Index' value the day after he left S&P's employ."

who is in the business of supplying information for the guidance of others in their business transactions. *Moorman*, 91 Ill. 2d at 88-89.

The *Moorman* exception regarding negligent misrepresentation has become the cutting edge for cases in Illinois. The focus is whether one is in the business of supplying information for the guidance of others or whether the information that is supplied is merely ancillary to the sale or in connection with the sale of merchandise or other matter. *Black, Jackson & Simmons Insurance Brokerage, Inc. v. International Business Machines Corp.* (1982), 109 Ill. App. 3d 132, 440 N.E.2d 282 (where IBM supplied information on data processing system that system would be satisfactory for plaintiff's needs, it was not in the business of supplying information for the guidance of others).

The facts of each case must be considered to determine whether the *Moorman* exception applies. For example, where a defendant bank investigated the credit of its customer, it was not found to be in the business of supplying information for the guidance of plaintiff, a third-party creditor who purported to rely on the information. *Popp v. Dyslin* (1986), 149 Ill. App. 3d 956, 962, 500 N.E.2d 1039.

Other cases which found that the *Moorman* exception did not apply: where information was supplied by one joint venturer to the other about a project in which they had invested (*Century Universal Enterprises, Inc. v. Triana Development Corp.* (1987), 158 Ill. App. 3d 182, 510 N.E.2d 1260); an insurance agent in the business of providing information to others where the information was supplied in connection with the sale of an insurance policy (*Lang v. Consumers Insurance Service, Inc.* (1991), 222 Ill. App. 3d 226, 583 N.E.2d 1147); and where information was provided in connection with the sale of building materials (*Knox College v. Celotex Corp.* (1983), 117 Ill. App. 3d 304, 453 N.E.2d 8). Similarly, information supplied by an architect is transformed into the building that he designs, but such information does not meet the *Moorman* test. *2314 Lincoln Park West Condominium Association v. Mann, Gin, Ebel & Frazier, Ltd.* (1990), 136 Ill. 2d 302, 555 N.E.2d 346.

On the other hand, we contrast *DuQuoin State Bank v. Norris City State Bank* (1992), 230 Ill. App. 3d 177, 595 N.E.2d 678, with *Popp.* In *DuQuoin*, defendant bank was in the business of supplying credit information about its customers to other financial institutions and could be held liable.

A similar rule finding liability may obtain with respect to a termite inspector who is required to provide a report (*Perschall v. Raney* (1985), 137 Ill. App. 3d 978, 484 N.E.2d 1286); accountants whose purpose and intent in the accountant-client relationship is to

benefit or influence a third party whose reliance is based upon these negligent representations (*Brumley v. Touche, Ross & Co.* (1985), 139 Ill. App. 3d 831, 487 N.E.2d 641); and an accountant who prepares financial forecasts used in offering statements, where the intent was to influence investors to purchase bonds (*Dalton v. Alston & Bird* (S.D. Ill. 1990), 741 F. Supp. 1322).

Unaffected are pre-*Moorman* decisions which determined that defendants were in the business of supplying information for the business guidance of others, such as a realtor from whom plaintiff sought advice rather than brokerage services (*Duhl v. Nash Realty Inc.* (1981), 102 Ill. App. 3d 483, 429 N.E.2d 1267), and a stock broker in the business of supplying information to customers (*Penrod v. Merrill Lynch, Pierce, Fenner & Smith, Inc.* (1979), 68 Ill. App. 3d 75, 385 N.E.2d 376).

When we consider *DuQuoin Bank, Brumley, Rozny, Perschall, Duhl, Penrod* and *Dalton*, as well as those cases which found the defendant not to be in the business of supplying information for the guidance of others, we see the scope of Illinois' recognition of a duty upon those who in the course of their business supply information for guidance of others in their business or commercial transactions.

■ The entire transaction that we consider in the instant case is founded upon information provided by the defendant. Option traders are required by the license agreement, the terms of which are incorporated into the Exchange rules, to exclusively use that information to settle their option contracts. Although S&P may suggest that it is merely selling a product, information is the product and it is clearly for the guidance of others in commercial transactions and, in fact, the determinative factor in those business transactions.

While S&P Indexes have been considered salable products, we do not believe that they shed their character as information used to guide the economic destinies of others. See *Standard & Poor's Corp. v. Commodity Exchange, Inc.* (2d Cir. 1982), 683 F.2d 704.

Additionally, we have required that the plaintiff reasonably rely upon the information conveyed by the defendant. *Connor v. Merrill Lynch Realty, Inc.* (1991), 220 Ill. App. 3d 522, 581 N.E.2d 196; *Greycas, Inc. v. Proud* (7th Cir. 1987), 826 F.2d 1560.

Moreover, courts have further required that the information supplier know that the recipient intends to rely upon the information. *Frymire v. Peat, Marwick, Mitchell & Co.* (N.D. Ill. 1987), 657 F. Supp. 889; *Ryan v. Kanne* (Iowa 1969), 170 N.W.2d 395.

Plaintiff alleges the requisite reliance when OCC, authorized to actually settle the option contracts, uses the information in its analysis of the sums due plaintiff and therefore fulfills this necessary element.

We are not unmindful of the implications of the first amendment to the United States Constitution on the purveyors of information. Publishers of books or periodicals are protected by constitutional imperatives as well as the limitations on one not in privity with the defendant where the publication is widely disseminated and the class of potential plaintiffs is multitudinous. *Alm v. Van Nostrand Reinhold Co.* (1985), 134 Ill. App. 3d 716, 480 N.E.2d 1263; *First Equity Corp. v. Standard & Poor's Corp.* (2d Cir. 1989), 869 F.2d 175; *Daniel v. Dow Jones & Co.* (1987), 137 Misc. 2d 94, 520 N.Y.S.2d 334.

We do not quarrel with that notion; however, in the case at bar, S&P has specifically contracted to provide information upon which, to a certainty, investments will be encouraged and determined solely on the basis of S&P Index values. Users of the information are not casual passersby, but rather individually employ S&P's information in their reliance on the price which their options will bring at market.

Cases involving accountants' or appraisers' liability have generally been limited by the scope of the appraisers' liability to a smaller or limited class of potential investors or parties relying on the accounting information or appraisal. *Brumley v. Touche, Ross & Co.* (1985), 139 Ill. App. 3d 831, 487 N.E.2d 641 (*Brumley II*) (court found the accountant-client relationship was created to benefit or influence particular third-party plaintiffs); *Brumley v. Touche, Ross & Co.* (1984), 123 Ill. App. 3d 636, 463 N.E.2d 195 (*Brumley I*); *Robin v. Falbo* (N.D. Ill., July 24, 1992), No. 91 C 2894.

However, in cases which are not restrained by *Moorman* limitations, a defendant's negligent performance of its undertaking should extend to that class of persons defendant could reasonably have foreseen would be damaged by its negligent performance. *Scott & Fetzer Co. v. Montgomery Ward & Co.* (1986), 112 Ill. 2d 378, 493 N.E.2d 1022 (installer of fire alarm system liable to those not in privity).

Again, we distinguish those cases from the case at bar because of the nature of the information to be supplied by S&P as well as the purpose for which that information was admittedly to be used.

On appeal, plaintiff asks that we consider portions of the license agreement between S&P and the CBOE which impose upon S&P the duty to promptly correct inaccuracies discovered by S&P or brought to S&P's attention.

Paragraph 12(b) of the license agreement provides that S&P will:

> "Promptly correct or instruct its agents to correct any inaccuracies in the S&P indexes within the control of S&P which are discovered by S&P or brought to its attention."

Plaintiff's complaint makes no allegation of this provision and the license agreement is not attached to the complaint as an exhibit. Accordingly, plaintiff has raised this issue for the first time on appeal.

We are not obliged to consider this issue. Although our mission is to examine plaintiff's complaint and give it every proper intendment, we are not required and decline to view the complaint in light of issues that might have been pled. *St. Louis v. Rockwell Graphic Systems, Inc.* (1991), 220 Ill. App. 3d 704, 581 N.E.2d 93.

The scope of our review in a section 2—615 motion is to determine whether allegations in the complaint, when construed in the light most favorable to plaintiff, are sufficient to set forth a cause of action upon which relief may be granted; if the complaint does not allege facts necessary to state a cause of action, a deficiency may not be cured by liberal construction. *Benhart v. Rockford Park District* (1991), 218 Ill. App. 3d 554, 578 N.E.2d 600.

Defendant argues and we agree that the complaint does not allege that S&P failed to "promptly correct inaccuracies discovered by it." Rather, the complaint suggests that the information as to the changed price was related to S&P's "contractor," ADP. The complaint does not appraise us of the precise relationship between S&P and ADP. There is no allegation that ADP is an agent of S&P for the purpose of receiving information from the New York Stock Exchange.

Persons or business entities employed for a single transaction or a series of transactions can be agents, even though as to their physical activities, they demean themselves as independent contractors. *Protective Insurance Co. v. Coleman* (1986), 144 Ill. App. 3d 682, 694, 494 N.E.2d 1241; *Kouba v. East Joliet Bank* (1985), 135 Ill. App. 3d 264, 267, 481 N.E.2d 325; *Hoffman & Morton Co. v. American Insurance Co.* (1962), 35 Ill. App. 2d 97, 102-03, 181 N.E.2d 821; see also *Freese v. Buoy* (1991), 217 Ill. App. 3d 234, 246, 576 N.E.2d 1176.

Lastly, we turn to the exculpatory clause set out in the license agreement between S&P and the CBOE which is incorporated into the CBOE rules to which plaintiff's purchases and sales are subject. The exculpatory clause by its terms provides that S&P does not guarantee the accuracy or the completeness of any of the S&P Indexes or the data included in them. Nor are any warranties provided as to results from the use of any of the data in connection with the trading of contracts. This language seems to directly relate to the transactions upon which plaintiff's cause of action is predicated.

■ While such exculpatory clauses may not be favored and are strictly construed against the benefitting party, there is a broad public policy permitting competent parties to contractually limit their respective liability and to allocate business risks in accordance with

their business judgment. *Harris v. Walker* (1988), 119 Ill. 2d 542, 519 N.E.2d 917; *McClure Engineering Associates, Inc. v. Reuben H. Donnelley Corp.* (1983), 95 Ill. 2d 68, 447 N.E.2d 400.

Our courts have been willing to enforce contractual clauses exempting a party from liability for its own negligence if it is clear from the contract that the parties' intent was to shift the risk of loss unless it would be against the settled public policy of our State to do so or there is something in the social relationship of the parties militating against recognition of such agreement.

Plaintiff relies on *Scott & Fetzer* (112 Ill. 2d 378, 493 N.E.2d 1022), which declined to give effect to an exculpatory clause between the owner of a warehouse and a fire alarm service in connection with the claims of tenants not in privity with the fire alarm service.

In *Scott & Fetzer* the court determined that the exculpatory clause was applicable only to the premises which were serviced under the contract and that the agreement between the owner and fire alarm company did not negate any duty to other tenants in the same building. In that case, the other tenants had no privity or relationship with the fire alarm company. On the other hand, in the case at bar, plaintiff has entered into the purchase and sale of S&P Indexes on the options exchange and does so subject to the exculpatory provisions of the license agreement which were a part of the CBOE rules regulating plaintiff's option trading.

*McClure* makes it clear that our courts are reluctant to find any special or social relationship that would obviate the impact of an exculpatory clause. However, we note the thoughtful dissent at the appellate level in *McClure Engineering Associates, Inc. v. Reuben H. Donnelley Corp.* (1981), 101 Ill. App. 3d 1109, 428 N.E.2d 1151, and even critics of *McClure* would not put the plaintiff here on the same footing as the plaintiff in that case.

In *McClure*, the supreme court gave effect to an exculpatory clause where defendant was the publisher of a telephone directory who failed to publish a listing for which a contract had been executed. The dissent at the appellate level noted that the publisher of the telephone directory was the equivalent of a protected monopoly service with no competing company and no competing telephone directory. Certainly, the plaintiff here is not in the same position. On the contrary, this plaintiff makes a conscious decision to invest his money in the trading of options subject to the exculpatory clause which is part of the CBOE licensing agreement and rules.

Even where a semi-public nature is found to permeate the transaction between the parties, the exculpatory clause will be recognized. *First Financial Insurance Co. v. Purolator Security, Inc.* (1979), 69 Ill.

App. 3d 413, 388 N.E.2d 17; *Pick Fisheries, Inc. v. Burns Electronic Services, Inc.* (1976), 35 Ill. App. 3d 467, 342 N.E.2d 105; *Simmons v. Columbus Venetian Stevens Buildings, Inc.* (1958), 20 Ill. App. 2d 1, 155 N.E.2d 372 (designating five types of relationships where contractual clauses attempting to divest liability for negligence may be void as to public policy: common carrier, innkeeper, bailor-bailee, employer-employee and landlord-tenant).

■ We believe that the trial court erred in determining that S&P did not owe a duty to plaintiff, that it had a special position as publisher of stock market indexes, that plaintiff did not rely on S&P representation, and that plaintiff was not a member of a limited class that might have been foreseeable to S&P.

However, we nonetheless affirm the trial court because we believe that there is no claim of disparity in the bargaining power between the respective parties and that the relationship between plaintiff and S&P was voluntarily entered into and not of such a semi-public character that limitations upon liability might be contrary to public policy.

We therefore give effect to the exculpatory clause contained in the license agreement between CBOE and S&P and affirm the trial court.

Affirmed.

TULLY, P.J., and RIZZI, J., concur.